UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

----------------------------------------------- X

BILLY MITCHELL,                                  :

            Plaintiff,                 :

          -against-                      :

                                 3:15-cv-05668 (AET) (LHG)

THE CARTOON NETWORK, INC., a          :
New York Corp., CARTOON                           Hearing:   November 2, 2015
NETWORK STUDIOS, INC., a              :                      10:00 A.M.
Georgia Corporation, TURNER                                  Courtroom 4W
BROADCASTING SYSTEM, INC., a          :
Georgia Corporation, John Does 1
through 10, fictitious designations,  :

           Defendants.                :

----------------------------------------------- X


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

LOEB & LOEB LLP
Jonathan Neil Strauss (JS1090)
Christian D. Carbone (*admitted pro hac vice*)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Defendants The Cartoon
Network, Inc., Cartoon Network Studios, Inc.
and Turner Broadcasting System, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................iii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ................................................................................. 5

I.      Plaintiff Billy Mitchell is an Acknowledged Celebrity, and the
        Antagonist of the Documentary Film "The King of Kong" ........................ 5

II.     Defendants' Animated Television Program "The Regular Show"
        and the Parodic Garrett Bobby Ferguson ("GBF") Character...................... 9

III.    The Present Dispute Has No Connection to this Forum ........................... 14

ARGUMENT ................................................................................................ 15

I.      Plaintiff's Complaint Should Be Dismissed Because He Fails To
        State a Claim as a Matter of Law .............................................................. 15

        A.      The Court Can, and Should, Dismiss Mitchell's Claims
                Based on Its Review of the Relevant Works as Documents
                Incorporated Into the Complaint by Reference................................ 15

        B.      Plaintiff's Claims are Barred by the First Amendment.................... 20

                1.      Under the "Transformative Use Test," Transformative
                        Depictions of a Celebrity Cannot Give Rise to a Right
                        of Publicity Claim ................................................................. 20

                2.      The GBF Character is a Transformative Parody of
                        Mitchell, and Cannot Give Rise to a Right of Publicity
                        Claim as a Matter of Law....................................................... 24

II.     In the Alternative, this Case Should Be Transferred to the Central
        District of California.................................................................................. 30

        A.      Venue is Improper Because None of the Parties Reside in
                New Jersey, and No Substantial Part of the Underlying
                Events Occurred in New Jersey ....................................................... 31

1.    Defendants Do Not All "Reside" in New Jersey (28 U.S.C. § 1391(b)(1)) ................................................ 31

      a.    This Court Lacks General Jurisdiction Over Defendants ................................................ 32

      b.    This Court Lacks Specific Jurisdiction Over Defendants ................................................ 34

      c.    The Court Cannot Reasonably Exercise Jurisdiction Over Defendants ...................................... 37

2.    No "Substantial Part of the Events or Omissions Giving Rise to the Claim" Occurred in New Jersey (28 U.S.C. § 1391(b)(2)) ................................................ 38

B.    Even if Venue is Not Improper, This Case Should be Transferred Pursuant to 28 U.S.C. § 1404(a) Because the Parties and the Dispute Have No Connection to New Jersey .......... 40

    1.    The Private Factors Favor Transfer ...................................... 42

      a.    Factors 1 and 2 (the Parties' Forum Preferences) Favor Transfer Because Neither Plaintiff, nor the Action, Has Any Connection to New Jersey ......... 42

      b.    Factor 3 (Where the Claim Arose) Favors Transfer ................................................ 45

      c.    Factor 4 (Convenience of the Parties) Favors Transfer ................................................ 45

      d.    Factors 5 (Availability of Witnesses) and 6 (Location of Documents) Favor Transfer or Are Neutral ................................................ 46

    2.    The Public Factors Similarly Favor Transfer ........................ 47

CONCLUSION ................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adjmi v. DLT Entm't LTD,*
No. 14 Civ. 568 (LAP), 2015 U.S. Dist. LEXIS 43285 (S.D.N.Y.
Mar. 21, 2015) ...................................................................................................18

*Annie Oakley Enters. v. Sunset Tan Corporate & Consulting, LLC,*
703 F. Supp. 2d 881 (N.D. Ind. 2010) ...............................................................35

*Auto Channel, Inc. v. Speedvision Network, LLC,*
995 F. Supp. 761 (W.D. Ky. 1997) .....................................................................35

*Brownmark Films, LLC v. Comedy Partners,*
682 F.3d 687 (7th Cir. 2012) ...............................................................17, 22, 27

*Buck v. Hampton Twp. Sch. Dist.,*
452 F.3d 256 (3d Cir. 2006) ...............................................................................15

*Burnett v. Twentieth Century Fox Film Corp.,*
491 F. Supp. 2d 962 (C.D. Cal. 2007) ................................................................18

*Busch v. Viacom Int'l, Inc.,*
477 F. Supp. 2d 764 (N.D. Tex. 2007) ...............................................................35

*Bustos v. United States,*
No. 08-cv-00153-LTB-MEH, 2009 U.S. Dist. LEXIS 73426 (D.
Colo. Aug. 21, 2009) ..........................................................................................18

*Calder v. Jones,*
465 U.S. 783 (1984) ............................................................................................36

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) .......................................................................21, 22, 26, 27

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
95 F.3d 959 (10th Cir. 1996) ......................................................................21, 27

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013) ..................................................................... 17, 27-28

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
25 Cal. 4th 387 (Cal. 2001)................................................................17, 20, 21, 22

*Corporate Trade, Inc. v. Golf Channel*,
No. 12-2421, 2012 U.S. Dist. LEXIS 189238 (D.N.J. Oct. 11,
2012) ....................................................................................................................33, 34

*Cottman Transmission Sys. v. Martino*,
36 F.3d 291 (3d Cir. 1994) ................................................................................38, 39

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)..........................................................................................32, 33

*Daly v. Viacom, Inc.*,
238 F. Supp. 2d 1118 (N.D. Cal. 2002)...................................................................18

*Database Am., Inc. v. Bellsouth Advertising & Publ'g Corp.*,
825 F. Supp. 1195 (D.N.J. 1993)..............................................................................32

*Esch v. Universal Pictures Co.*,
No. 6:09-cv-02258-JEO, 2010 U.S. Dist. LEXIS 140543 (N.D.
Ala. Nov. 2, 2010) ...................................................................................................18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
131 S.Ct. 2846 (2011)........................................................................................32, 33

*Guglielmi v. Spelling-Goldberg Prods.*,
25 Cal.3d 860 (Cal. 1979).........................................................................................23

*Hart v. Electronic Arts, Inc.*,
717 F.3d 141 (3d Cir. 2013) .............................................................................*passim*

*Hedges v. United States*,
404 F.3d 744 (3d Cir. 2005) ....................................................................................15

*Hicks v. Casablanca Records*,
464 F. Supp. 426 (S.D.N.Y. 1978) ..........................................................................23

*Horne v. Adolph Coors Co.*,
684 F.2d 255 (3d Cir. 1982) ....................................................................................36

*IMO Indus. v. Kiekert AG*,
155 F.3d 254 (3d Cir. 1998) ................................................................................36-37

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)..............................................................................38

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995) ................................................... 40-41, 46

*Kelly-Brown v. Winfrey*,
No. 11-4360, 2011 U.S. Dist. LEXIS 127213 (D.N.J. Nov. 3,
2011) ........................................................................................*passim*

*Lacey v. Cessna Aircraft Co.*,
862 F.2d 38 (3d Cir. 1988) .................................................................47

*LG Elecs. Inc. v. First Int'l Computer*,
138 F. Supp. 2d 574 (D.N.J. 2001).............................................42, 47

*Lony v. E.I. DuPont de Nemours & Co.*,
886 F.2d 628 (3d Cir. 1989) ..............................................................42

*Love v. Associated Newspapers*,
611 F.3d 601 (9th Cir. 2010) .............................................................36

*Mann v. Brenner*,
375 F. App'x 232 (3d Cir. 2010) .......................................................15

*Matthews v. Wozencraft*,
15 F.3d 432 (5th Cir. 1994) ......................................................... 22-23

*Mendoza v. U.S. Custom and Border Prot.*,
No. 05-6017, 2007 U.S. Dist. LEXIS 18963 (D.N.J. Mar. 19, 2007) ...............42

*Moore v. Weinstein Co.*,
545 F. App'x 405 (6th Cir. 2013) ......................................................22

*Mullis v. Wright*,
No. 89-2379-OG, 1990 U.S. Dist. LEXIS 1706 (D.D.C. Feb. 9,
1990) ....................................................................................................39

*NXIVM Corp. v. Sutton*,
No. 06-cv-1051 (DMC), 2007 U.S. Dist. LEXIS 46471 (D.N.J.
June 27, 2007)......................................................................................16

*O'Connor v. Sandy Lane Hotel Co.*,
   496 F.3d 312 (3d Cir. 2007) ..................................................34, 35, 37

*Outdoor Channel, Inc. v. Performance One Media, LLC*,
   826 F. Supp. 2d 1271 (N.D. Okla. 2011)...........................................34

*Penguin Group (USA) Inc. v. Am. Buddha*,
   640 F.3d 497 (2d Cir. 2011) ............................................................36

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ..........................................................15

*Pino v. Viacom, Inc.*,
   No. 07-3313 (AET), 2008 U.S. Dist. LEXIS 24453 (D.N.J. Mar. 4,
   2008) ...............................................................................................19

*Polydoros v. Twentieth Century Fox Film Corp.*,
   67 Cal. App. 4th 318 (Cal. App. 1997)..............................................23

*Prima v. Darden Restaurants*,
   78 F. Supp. 2d 337 (D.N.J. 2000)......................................................20

*Raymen v. United Senior Ass'n*,
   409 F. Supp. 2d 15 (D.D.C. 2006)......................................................18

*Ricoh Co. v. Honeywell, Inc.*,
   817 F. Supp. 473 (D.N.J. 1993).........................................44, 45, 47

*In re Rockefeller Ctr. Props. Sec. Litig.*,
   184 F.3d 280 (3d Cir. 1999) ............................................................15

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ............................................................22

*Ruffin-Steinback v. de Passe*,
   82 F. Supp. 2d 723 (E.D. Mich. 2000) ..............................................23

*Scott v. Lackey*,
   587 F. App'x 712 (3d Cir. 2014) ......................................................37

*Seale v. Gramercy Pictures*,
   949 F. Supp. 331 (E.D. Pa. 1996)......................................................23

*Tanikumi v. Walt Disney Co.*,
  No. Civ. 14-5877, 2015 U.S. Dist. LEXIS 42641 (D.N.J. Apr. 1,
  2015) ................................................................................................16

*Thayil v. Cowell*,
  No. 10-3200-CV-S-RED, 2011 U.S. Dist. LEXIS 6798 (W.D. Mo.
  Jan. 25, 2011)..................................................................................39

*Thoroughbred Legends, LLC v. Walt Disney Co.*,
  No. 1:07-CV-1275-BBM, 2008 U.S. Dist. LEXIS 19960 (N.D. Ga.
  Feb. 12, 2008) ..................................................................................18

*Tyne v. Time Warner Entm't Co.*,
  204 F. Supp. 2d 1338 (M.D. Fla. 2002), *aff'd on other grounds*,
  425 F.3d 1363 (11th Cir. 2005) ........................................................23

*Vijay v. Twentieth Century Fox Film Corp.*,
  No. CV 14-5404 RSWL (Ex), 2014 U.S. Dist. LEXIS 152098
  (C.D. Cal. Oct. 27, 2014)..................................................................18

*Virag, S.R.L. v. Sony Computer Entm't Am. LLC*,
  No. 14-4786 (KM), 2015 U.S. Dist. LEXIS 39910 (D.N.J. Mar. 30,
  2015) ............................................................................43, 44, 47, 48

*Winstead v. Jackson*,
  509 F. App'x 139 (3d Cir. 2013) ................................................16, 19

*Winter v. DC Comics*,
  30 Cal. 4th 881 (Cal. 2003)........................................................*passim*

*Wm. H. McGee & Co. v. United Arab Shipping Co.*,
  6 F. Supp. 2d 283 (D.N.J. 1997) ................................................42, 44

## Statutes

28 U.S.C. § 1391 ....................................................................31, 32, 38

28 U.S.C. § 1392 ................................................................................40

## Other Authorities

*Restatement (Third) of Unfair Competition*, § 47, cmt. c (1995) ............................23

Defendants The Cartoon Network, Inc. ("TCN, Inc."), Turner Broadcasting System, Inc. ("TBS, Inc.") and Cartoon Network Studios, Inc. ("CNS, Inc.") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint in this action (the "Complaint" or "Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to transfer this action to the Central District of California pursuant to 28 U.S.C. § 1391 and/or 28 U.S.C. § 1404.

## PRELIMINARY STATEMENT

"The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire.  Rather, prominence invites creative comment." *Hart v. Electronic Arts, Inc.*, 717 F.3d 141, 154 n.16 (3d Cir. 2013) (quotation omitted).  Despite this well-established principle, plaintiff Billy Mitchell ("Plaintiff" or "Mitchell"), an acknowledged celebrity, claims that his right of publicity is infringed by the obviously parodic character "Garrett Bobby Ferguson"—also known as "GBF" or "Giant Bearded Face"—a giant, disembodied floating head from outer space that has appeared in four episodes of the surreal, comedic animated television series *The Regular Show*.

Unfortunately for Mitchell, it is difficult to imagine a more paradigmatic example of the type of transformative, expressive use of a celebrity's persona that is absolutely protected by the First Amendment.  Courts have long recognized that

1

the right of publicity does not preclude others from incorporating a celebrity's name or likeness in, *inter alia*, films, television shows, books or similar expressive works, with the Third Circuit recently adopting the "Transformative Use" test as the proper framework for determining whether a right of publicity claim is barred by the First Amendment.   Under this test, the use of a plaintiff's likeness is protected by the First Amendment, and cannot give rise to a right of publicity claim, if the celebrity's likeness is just one of the "'raw materials' from which an original work is synthesized…." *Hart*, 717 F.3d at 160 (citation omitted).  Based on a review of the relevant *The Regular Show* episodes as documents incorporated by reference in the Complaint, there can be no doubt that the GBF character, as shown in the picture below, satisfies this test, as GBF is not a literal, realistic depiction of Mitchell, but rather an obviously transformative parody.



Indeed, in *Hart*, the Third Circuit already expressly resolved the issue presented by Mitchell's Complaint, repeatedly citing with approval the California Supreme Court's decision in *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003), a

case that is on all fours with the present dispute.  *See Hart*, 717 F.3d at 160-61, 168-69.  In *Winter*, the court rejected a right of publicity claim brought by two musicians, Johnny and Edgar Winter, over a comic book that featured the characters "Johnny and Edgar Autumn," villainous half-man, half-worm creatures that shared some of the plaintiffs' distinct features, holding, *inter alia*, that "[a]lthough the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally," and that "plaintiffs are merely part of the raw materials from which the comic books were synthesized."  30 Cal. 4th at 891.  The Third Circuit recognized that the use of plaintiffs' images in *Winter* was "highly transformative," in that it involved "fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities"—a conclusion that is equally true here.  *Hart*, 717 F.3d at 161.

If anything, the use at issue here is even *more* transformative than that in *Winter* because, unlike the Autumn Brothers, the GBF character actually comments on and criticizes the celebrity from which it is drawn.  Indeed, the GBF character parodies Mitchell, one of the stars of, and the antagonist in, the acclaimed documentary film *The King of Kong*—a film that is also incorporated by reference in the Complaint.  Through GBF, *The Regular Show* comments on and criticizes Mitchell's appearance in that film, and lampoons his role as the "villain" by portraying GBF as cartoonishly evil, going so far as to depict him leading an

army of undead villains that attempt to conquer the park in which *The Regular Show* is set.  While a depiction of a celebrity need not be a "parody" in order to be transformative, a simple review of the subject works unquestionably reveals that GBF <u>is</u> a parody—a type of work that courts have long recognized as transformative, and entitled to the strongest First Amendment protections.  This further demonstrates why Mitchell's claims must be dismissed, as a matter of law.

Simply put, for Mitchell to prevail would require the Court to hold that every depiction of a celebrity in a fictional television show—every Saturday Night Live sketch involving a celebrity impersonation, every *Simpsons*, *South Park*, *Family Guy* or other animated program depicting celebrities or newsmakers, and so on—is actionable.  This is obviously not the law.  Mitchell's claim is without merit, and should be dismissed.

In the alternative, this action should be transferred to the Central District of California (where the acts giving rise to Mitchell's claims took place), because this judicial district is not a proper venue.  The present dispute simply has no conceivable connection to this forum.  None of the parties are New Jersey residents—Mitchell himself is a resident of Florida, not New Jersey, and the Defendants are based in and/or operate in Georgia and California, and have no systematic contacts with New Jersey.  None of the events giving rise to this action took place in New Jersey—rather, they took place in California, where the

allegedly infringing GBF character was created.  And, if this action were to somehow survive a motion to dismiss, none of the relevant witnesses or documents are located in New Jersey.

Mitchell's decision to nevertheless file suit in a district that has no connection to his claim is a transparent attempt at forum-shopping, based on an (erroneous) belief that New Jersey law supports his claims.  While Mitchell's reading of the relevant law is misguided, his forum-shopping should not be countenanced.  To the extent the Court elects not to dismiss Mitchell's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants respectfully request that this action be transferred to the Central District of California pursuant to 28 U.S.C. §§1391 and/or 1404.

## STATEMENT OF FACTS[1]

### I.   Plaintiff Billy Mitchell is an Acknowledged Celebrity, and the Antagonist of the Documentary Film "*The King of Kong*"

Mitchell is a self-acknowledged celebrity and "world wide recognized figure in the [video] gaming community," as reflected by numerous accolades and recognitions he identifies in his Complaint.  (Compl. ¶ 17).  Mitchell is perhaps

---

[1] The facts set forth herein in support of Defendants' motion to dismiss are taken from the Complaint in this action (the allegations of which are presumed to be true solely for purposes of this motion) and from documents incorporated by reference therein (including the episodes of *The Regular Show* in which the GBF character appears, and the documentary film *The King of Kong*, which features the plaintiff). Additional facts relating solely to Defendants' motion, in the alternative, to transfer venue are taken from the Declaration of David C. Vigilante annexed hereto.

most well-known to mainstream audiences as the antagonist of the critically-acclaimed documentary film *The King of Kong*, which is incorporated by reference in paragraph 17.Z of the Complaint, and a copy of which is annexed as Exhibit A to the accompanying declaration of Jonathan Strauss ("Strauss Decl.").

 

*The King of Kong* tells the story of the battle between Mitchell and Steve Wiebe ("Wiebe") to set the world record for the high-score on the video game *Donkey Kong*. Mitchell, the reigning world-record holder, is described as the "Gamer of the Century," and a long-time video game legend. (Strauss Decl. Ex. A at 0:00-9:03). Portrayed as successful, boastful and arrogant, with adoring fans, Mitchell is contrasted with his rival, Wiebe, a laid-off Boeing engineer, whom his friends and wife describe as an unfortunate figure who has never been able to achieve success despite various skills. (*Id.* at 9:04-13:06). After reading about

---

[2] The above images of Plaintiff are screenshots from the film *The Kong of Kong*. (Strauss Decl. Ex. A at 00:26, 4:24).

Mitchell's Donkey Kong world record, Wiebe focuses on mastering the game, achieving a record-breaking score of 1,006,600, which he submits via video tape to Twin Galaxies, the official video game record adjudicator. (*Id.* at 13:07-22:30).

Mitchell—himself a Twin Galaxies referee (*id.* at 20:20-20:40)—does not accept defeat graciously, sending Twin Galaxies representatives to Wiebe's home to investigate his machine. After determining that the machine's circuit board was provided by one of Mitchell's rivals, Twin Galaxies refuses to recognize Wiebe's score, with one official speculating about a "conspiracy." (*Id.* at 24:15-31:28).

Determined to prove the legitimacy of his record, Wiebe travels to the Twin Galaxies-sanctioned Funspot arcade in New Hampshire to achieve a high-score live, before high-ranking Twin Galaxies officials. (*Id.* at 31:28-33:35). Prior to departing for New Hampshire, Wiebe challenges Mitchell to play head-to-head at Funspot. Mitchell does not attend, but his supporter Brian Kuh—one of the investigators who challenged Wiebe's score—observes the proceedings on Mitchell's behalf, reporting back to Mitchell throughout Wiebe's game. (*Id.* at 33:15-39:00). Wiebe successfully achieves a world-record high score of 985,600 points. However, Mitchell immediately has Kuh deliver a low-quality VHS to Twin Galaxies, purportedly depicting himself achieving a higher score of 1,047,200 points. When Wiebe later asks for permission to view a portion of Mitchell's tape, Kuh refuses. (*Id.* at 39:00-50:35).

The film casts doubt on the veracity of Mitchell's score, noting irregularities with the tape.  Nevertheless, despite having scrutinized and rejected Wiebe's previous video-tape submission, Twin Galaxies immediately accepts Mitchell's tape and declares him the world-record holder once again.  (*Id.* at 50:35-52:50). The film depicts Twin Galaxies and Mitchell's actions as hypocritical and contrary to their own prior, repeated assertions that only live scores are legitimate, including Mitchell's statement that:

> To me, most importantly is you travel to a sanctioned location, like Funspot that makes it official; if tomorrow Tiger Woods goes and he golfs a 59, big deal.  If he does it at Augusta, that's where it counts.

(*Id.* at 31:28-31:52; *see also, e.g., id.* at 35:11-35:26, 39:52-40:10, 44:45-45:20, 52:50-54:03, 57:45-58:18, 59:10-59:18, 1:12:00-1:12:40).

Months later, Wiebe travels to a Guinness Book of World Records-sponsored tournament in Hollywood, Florida, near Mitchell's home, to challenge Mitchell to a public competition.  Wiebe waits four days to play Mitchell, who finally shows up at the arcade on the third day but does not play.  (*Id.* 58:19-1:14:07).  Mitchell ignores Wiebe's greeting, saying to his wife:  "There's certain people I don't want to spend too much time with."  (*Id.* at 1:11:30-1:11:45).

Wiebe fails to set the world record while in Florida (*id.* at 1:14:07-1:16:10), but the film shows that, in the end, Wiebe has earned the respect and admiration of

Twin Galaxies' founder, and even one of Mitchell's closest confidantes.  Mitchell, however, refuses to echo those sentiments.  (*Id.* at 1:16:19-1:18:10).

## II.    Defendants' Animated Television Program "*The Regular Show*" and the Parodic Garrett Bobby Ferguson ("GBF") Character

*The Regular Show* is a comedic animated television series that airs on The Cartoon Network channel, and which is incorporated by reference in the Complaint.  (Compl. ¶¶ 2, 7-8, 19).  The series revolves around the surreal, often supernatural, misadventures of two anthropomorphic animals, a blue jay named Mordecai and a raccoon named Rigby who are employed as groundskeepers at a local park, and also frequently features supporting characters including Benson (a living gumball machine who works as the manager of the park), Pops (a man with a lollipop for a head, who lives in the park), and Mordecai and Rigby's co-workers Skips (a yeti), Muscle Man (a short, obese green-skinned monster) and Hi Five Ghost (a small ghost with a hand extending from the top of his head, which he uses to "high five" people).  (*See generally* Strauss Decl. Exs. B-E).

Garrett Bobby Ferguson, also known as "GBF," is a villainous character that appears or is referenced, to varying degrees, in just four of *The Regular Show*'s approximately 194 episodes.  (Compl. ¶ 19; Strauss Decl. Exs. B-E).  GBF is a giant floating head from outer space.  The character has no torso, but can extend arms and legs from his head as necessary.  While an obvious parody of Mitchell's appearance in *The King of Kong*, GBF is not a literal depiction of Mitchell; indeed,

GBF does not remotely resemble any realistic depiction of a human being:




GBF first appears in *High Score*, an episode from *The Regular Show*'s second season that originally aired on February 7, 2011.  (Strauss Decl. ¶ 3, Ex. B). In the episode, Mordecai and Rigby attempt to earn respect by becoming experts at an arcade game in their local coffee shop, called "Broken Bonez."  (*Id.* at 0:00-4:00).  After they successfully set the "Broken Bonez" world record, GBF beams into the coffee shop from the sky, bragging that he still holds the "universe record."  The crowd, which had previously cheered for Mordecai and Rigby, rushes to GBF, adoringly stroking his beard.  (*Id.* at 5:30-7:15).  Mordecai and Rigby challenge GBF to a head-to-head match for the universal record—GBF accepts, sprouting arms and legs from his face in order to play.  (*Id.* at 7:15-7:30).

---

[3] The preceding images are captured from Strauss Decl. Ex. B at 6:45 and 7:34.

As Mordecai and Rigby close in on the record, GBF begins to sob, begging them to let him win, claiming that he has devoted his life to "Broken Bonez," that he has played so much that his wife left him, and that the universe record is all he has. (*Id.* at 8:15-8:43). Mordecai and Rigby choose to throw the contest; however, the villainous GBF reveals that he lied, and that he never had a wife. (*Id.* at 8:45-9:35). Mordecai and Rigby then resume playing, ultimately beating GBF's record, resulting in his head exploding into goo. (*Id.* at 9:35-11:00).

GBF's only other substantive appearance is in the season four episode *Exit 9B*, which features a bearded villain who takes over the park and brainwashes its denizens. (Strauss Decl. Ex. C at 0:00-11:30). After capturing Mordecai, Rigby and their friends, the villain detaches his head from his artificial body and reveals himself to be Garrett Bobby Ferguson, Jr. ("GBF Jr."), "the son of universally-renowned gaming champion Garrett Bobby Ferguson." (*Id.* at 11:00-12:30).



Determined to get revenge on Mordecai and Rigby for blowing up his father, GBF Jr. revives dozens of slain enemies from past episodes of *The Regular Show*,

---

[4] The preceding image is captured from Strauss Decl. Ex. C at 12:17.

including GBF himself, with father and son embracing each other after sprouting limbs from their floating heads.  (*Id.* at 12:30-14:00).

  

After a battle featuring dozens of the fantastic, surreal villains and allies from past episodes (including enormous chubby babies shooting lasers, zombies, an anthropomorphic, sunglass-wearing cassette tape,  a giant red woman in a pantsuit, living hot-dogs, and a colossal human-eagle hybrid), the revived villains are sucked through a portal back into the afterlife.  (*Id.* at 14:00-21:20).  Angered by the failure of their evil plan, GBF accuses his son of breaking "the universe record for disappointing your father!," and both GBF and his son's heads explode into goo, as in the GBF character's first appearance.  (*Id.* at 21:20-21:35).

GBF's remaining appearances are fleeting.   In the third-season episode *Video Game Wizards* a bronze statue of GBF appears outside of a convention center in which a video game competition is taking place.  (Strauss Decl. Ex. D at 8:56-8:59).  The fifth-season episode *Expert or Liar* primarily concerns Rigby's

---

[5] The preceding images are captured from 13:44-13:54 of Strauss Decl. Ex. C.

appearances on a popular game show, whose host ambushes contestants in the street and asks them questions on a topic in which they claim to have expertise; if the contestant gets a question wrong, he is branded a liar on national TV.  (Strauss Decl. Ex. E at 0:30-1:50).  Appearing on the game show as an expert on the topic of video games (*id.* at 8:55-10:20), Rigby's final question is "Who holds the universe record in the game 'Broken Bonez'?"  Rigby answers that "it was Garrett Bobby Ferguson"—until Rigby and Mordecai defeated him—and then knocks the host off of his floating platform, whereupon the host is swallowed whole by a pixelated version of GBF …



… which then explodes.  (*Id.* at 10:20-11:00).

---

[6] The preceding image is captured from Strauss Decl. Ex. E at 10:54.

### III.    The Present Dispute Has No Connection to this Forum

In a transparent attempt at forum-shopping, based on an apparent (erroneous) belief that New Jersey law supports his claims, Mitchell, a Florida resident, has filed his Complaint in this Court even though the present dispute has no conceivable connection to this forum.

<u>First</u>, none of the parties are New Jersey residents. Mitchell is a resident of the state of Florida, not New Jersey. (Compl. ¶ 6). Nor are any of the Defendants residents of New Jersey. Defendant The Cartoon Network, Inc. ("TCN, Inc.") is a Delaware corporation with its principal place of business in Atlanta, Georgia. (*See* Declaration of David C. Vigilante, dated September 25, 2015 ("Vigilante Decl."), ¶ 5). Defendants Turner Broadcasting System, Inc. ("TBS, Inc.") and Cartoon Network Studios, Inc. ("CNS, Inc.") are Georgia corporations, also with principal places of business in Atlanta, Georgia. (*Id.* ¶¶ 4, 6). In addition, CNS, Inc.—the true party in interest, which is responsible for the creation of *The Regular Show* and the GBF character—maintains its creative and production operations, including all of its full-time employees, in the state of California. (*Id.* ¶¶ 6, 13-17). None of the Defendants are registered to do business in New Jersey, have any offices in New Jersey, lease or own any property in New Jersey, or maintain any bank accounts in New Jersey. (*Id.* ¶¶ 7-11).

Second, and relatedly, none of the events giving rise to this action took place in New Jersey.  No work relating to the creation of the GBF character took place in New Jersey—rather, the character was created entirely by employees of CNS, Inc. and staff writers on *The Regular Show* in California.  For this reason, all relevant witnesses and documents are located in California, not New Jersey.  (*Id.* ¶¶ 12-17).

## ARGUMENT

I.    **PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE HE FAILS TO STATE A CLAIM AS A MATTER OF LAW**

A.    **The Court Can, and Should, Dismiss Mitchell's Claims Based on Its Review of the Relevant Works as Documents Incorporated Into the Complaint by Reference**

A complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) where, accepting all of the complaint's well-pleaded allegations as true, the defendant is nevertheless entitled to judgment as a matter of law.  *See, e.g., Mann v. Brenner*, 375 F. App'x 232, 235 (3d Cir. 2010); *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

When ruling on a motion to dismiss, a court may consider not only the plaintiff's allegations, but also documents that are incorporated by reference, integral to, or explicitly relied on in the complaint.  *See, e.g., Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Accordingly, when faced

with a claim that defendants' audiovisual, literary, musical or similar expressive works somehow infringes a plaintiff's rights, courts in this Circuit regularly examine the subject works when considering a Rule 12(b)(6) motion to dismiss, and dismiss the complaint when such review demonstrates that the plaintiff cannot state a claim as a matter of law. *See, e.g., Winstead v. Jackson*, 509 F. App'x 139, 143 (3d Cir. 2013) (affirming dismissal of copyright infringement claim for lack of substantial similarity between plaintiff's book and defendants' album and film, based on court's review of the subject works, because "the District Court had before it all that was necessary in order to make the required determination"); *Tanikumi v. Walt Disney Co.*, No. Civ. 14-5877, 2015 U.S. Dist. LEXIS 42641, at *3 (D.N.J. Apr. 1, 2015) (dismissing copyright infringement claim for lack of protectable similarities between plaintiff's book and defendants' film, based on review of underlying works); *NXIVM Corp. v. Sutton*, No. 06-cv-1051 (DMC), 2007 U.S. Dist. LEXIS 46471, at *18-38 (D.N.J. June 27, 2007) (granting judgment on the pleadings dismissing trade libel claims where, based on review of the subject website articles, they constituted nonactionable opinion protected by the First Amendment).

Here, Mitchell's Complaint, while presented as containing two separate counts, alleges that Defendants, by including the GBF character in *The Regular Show*, misappropriated Mitchell's identity for a commercial purpose (Compl. ¶¶

26-40).  In New Jersey, such a claim for "misappropriation of [another's] name or likeness" is commonly referred to as a "right of publicity" claim, and Defendants collectively refer to Mitchell's claims as such for purposes of this brief.  *See Hart*, 717 F.3d at 151 (stating that "[t]he current incarnation of the right of publicity in New Jersey is that set forth in the *Restatement (Second) of Torts* (1977)" as "appropriation of the other's name or likeness").  However, as explained in further detail below, Mitchell's claims are barred by the First Amendment because the GBF character appearing in *The Regular Show* satisfies the "Transformative Use" test (*infra* at 20-30)—a test that borrows the concept of "transformativeness" from the Copyright Act's fair use doctrine.  *See Hart*, 717 F.3d at 158; *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 404 (Cal. 2001).    Courts throughout the country do not hesitate to dismiss copyright or right of publicity claims as a matter of law, based on nothing more than a review of the subject works, when the requisite "transformativeness" is plain from a review of the works, or when a defendant's work is otherwise protected by the First Amendment.  *See, e.g., Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) ("[O]ur observation of [defendant's] artworks themselves convinces us of the transformative nature of all but five . . ."); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692-93 (7th Cir. 2012) ("When a defendant raises a fair use defense claiming his or her work is a parody, a court can often decide the merits of the claim without

discovery or a trial.  When the two works in this case are viewed side-by-side, the

*South Park* episode is clearly a parody of [plaintiff's] video…. This kind of

parodic use has obvious transformative value…."); *Adjmi v. DLT Entm't LTD*, No.

14 Civ. 568 (LAP), 2015 U.S. Dist. LEXIS 43285, at *39-48 (S.D.N.Y. Mar. 21,

2015) (determining that defendants' work was transformative parody as a matter of

law, and that no set of facts could support plaintiff's infringement claim, based

solely on review of subject works); *Burnett v. Twentieth Century Fox Film Corp.*,

491 F. Supp. 2d 962, 967-69 (C.D. Cal. 2007) (granting motion to dismiss after

concluding, based on review of the allegedly infringing *Family Guy* episode, that

"[t]he episode at issue put a cartoon version of Carol Burnett/the Charwoman in an

awkward, ridiculous, crude and absurd situation in order to lampoon and parody

her as a public figure" and was thus "transformative").[7]

    Indeed, in *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003)—a case cited

extensively, with approval, by the Third Circuit in *Hart*, 717 F.3d at 160-61, 168-

---

[7] *See also, e.g., Vijay v. Twentieth Century Fox Film Corp.*, No. CV 14-5404 RSWL (Ex), 2014 U.S. Dist. LEXIS 152098, at *12-14 (C.D. Cal. Oct. 27, 2014) (granting Rule 12(b)(6) motion dismissing right of publicity claim based on review of underlying work); *Esch v. Universal Pictures Co.*, No. 6:09-cv-02258-JEO, 2010 U.S. Dist. LEXIS 140543, at *17 (N.D. Ala. Nov. 2, 2010) (same); *Bustos v. United States*, No. 08-cv-00153-LTB-MEH, 2009 U.S. Dist. LEXIS 73426, at *11-12 (D. Colo. Aug. 21, 2009) (same); *Thoroughbred Legends, LLC v. Walt Disney Co.*, No. 1:07-CV-1275-BBM, 2008 U.S. Dist. LEXIS 19960, at *35-38 (N.D. Ga. Feb. 12, 2008) (same); *Raymen v. United Senior Ass'n*, 409 F. Supp. 2d 15, 25 (D.D.C. 2006) (same); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1122-23 (N.D. Cal. 2002) (same).

69, and discussed in more detail below—the California Supreme Court recognized that "speedy resolution of [right of publicity] cases involving free speech" is particularly desirable, as "unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights," and courts can often resolve right of publicity claims as a matter of law "simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person or persons portrayed." *Winter*, 30 Cal. 4th at 891-92 (quotations omitted). Here, as the Court will see, simply watching *The Regular Show* episodes featuring the GBF character demonstrates that the character is a transformative parody, and cannot give rise to a right of publicity claim as a matter of law.[8]

---

[8] In the alternative, if the Court so chooses it may convert Defendants' motion into one for summary judgment, and grant summary judgment dismissing the Complaint. Fed. R. Civ. Pro. 12(d); *see also Pino v. Viacom, Inc.*, No. 07-3313 (AET), 2008 U.S. Dist. LEXIS 24453, at *10, 23 (D.N.J. Mar. 4, 2008) (Thompson, J.) (converting motion to dismiss into one for summary judgment, and dismissing infringement claim based on review of subject works and related documents). In this regard, no discovery will be necessary—a simple review of the subject works will reveal that the GBF character is transformative as a matter of law, and no amount of discovery can alter this result. *Cf. Winstead*, 509 F. App'x at 143 ("When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a visual comparison of the works.'") (quoting *Peter F. Gaito Arch., LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010)).

19

### B.  Plaintiff's Claims are Barred by the First Amendment[9]

#### 1.    Under the "Transformative Use Test," Transformative Depictions of a Celebrity Cannot Give Rise to a Right of Publicity Claim

Courts have long recognized "the tension between the First Amendment and the right of publicity," and have adopted various balancing tests to determine when the First Amendment right to free speech trumps an individual's state law right of publicity claim. *See Hart*, 717 F.3d at 149, 152-53.  In *Hart v. Electronic Arts, Inc.*, the Third Circuit recently adopted the "Transformative Use Test," first enunciated by the California Supreme Court in *Comedy III Prods. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (Cal. 2001), as the proper framework "to balance the interest protected by the right of publicity against those interests preserved by the First Amendment."  *Hart*, 717 F.3d at 158, 163.

Under this test, the use of a plaintiff's likeness is protected by the First Amendment, and cannot give rise to a right of publicity claim, if it is "transformative," *i.e.* if it "adds something new" to the literal depiction of the plaintiff, "with a further purpose or different character, altering [the literal

---

[9] As explained *infra* at 38-40, 42-45, the present dispute has no connection to New Jersey, and thus New Jersey law would not ultimately apply to any cognizable right of publicity claim.  *See, e.g., Prima v. Darden Restaurants*, 78 F. Supp. 2d 337, 344 (D.N.J. 2000) ("New Jersey applies a flexible governmental interest analysis requiring application of the law of the state with the greatest interest in resolving the particular issue.").  However, choice of law need not be addressed for purposes of the present motion, because Plaintiff's claims are barred by the First Amendment regardless of which state's laws would otherwise apply.

depiction] with new expression, meaning, or message." *Id.* at 159 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) and *Comedy III Prods.*, 25 Cal. 4th at 404). Stated another way, the Transformative Use Test asks:

> [W]hether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.

*Hart*, 717 F.3d at 160 (quoting *Comedy III Prods.*, 25 Cal. 4th at 406).

Courts have repeatedly recognized that works of parody are a paradigmatic transformative use, entitled to the utmost protection under the First Amendment. *See, e.g., Hart*, 717 F.3d at 154 n.16 ("The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment.") (quoting *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 869 (Cal. 1979)); *Comedy III Prods.*, 25 Cal. 4th at 403, 405 ("Once the celebrity thrusts himself or herself forward into the limelight, the First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope," and "First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 969, 972-73 (10th Cir. 1996) ("*Cardtoons*' parody trading cards receive full protection under the First

Amendment…. Because celebrities are an important part of our public vocabulary, a parody of a celebrity does not merely lampoon the celebrity, but exposes the weakness of the idea or value that the celebrity symbolizes in society.").[10]

Courts have also emphasized that "the transformative elements or creative contributions that require First Amendment protection are not confined to parody and can take many forms," including, *inter alia*, "fictionalized portrayal," "heavy-handed lampooning" and "subtle social criticism." *Comedy III Prods.*, 25 Cal. 4th at 406; *Hart*, 717 F.3d at 159 (same). Thus, even prior to formulation of the Transformative Use test, courts have repeatedly rejected right of publicity claims involving depictions of real-life individuals in films, television shows, books and similar expressive works—whether factual or fictional—as contrary to the First Amendment. *See, e.g., Moore v. Weinstein Co.*, 545 F. App'x 405, 409 (6th Cir. 2013) (right of publicity claim based on purported use of plaintiff's identity in fictional motion picture barred under transformative use test, because "[w]ithout a doubt, the Movie added significant expressive elements to any purported use of [plaintiff's] identity"); *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989) (right of publicity does not "bar the use of a celebrity's name in the title and text of a fictional or semi-fictional book or movie"); *Matthews v. Wozencraft*, 15 F.3d

---

[10] *See also, e.g., Campbell*, 510 U.S. at 579 ("[P]arody has an obvious claim to transformative value …."); *Brownmark Films*, 682 F.2d at 693 ("This kind of parodic use has obvious transformative value ….").

432, 439 (5th Cir. 1994) ("Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story").[11] The Third Circuit, in adopting the Transformative Use Test, recognized that the test was consistent with such results, stating that fictional depictions of celebrities "transform" the celebrities' identities "so as to tip the balance of interests in favor

---

[11] *See also, e.g., Tyne v. Time Warner Entm't Co.*, 204 F. Supp. 2d 1338, 1342 (M.D. Fla. 2002) (denying right of publicity claim brought by heirs of deceased crew members featured in film *The Perfect Storm* as, *inter alia*, barred by First Amendment), *aff'd on other grounds*, 425 F.3d 1363 (11th Cir. 2005); *Ruffin-Steinback v. de Passe*, 82 F. Supp. 2d 723, 730-31 (E.D. Mich. 2000) (right of publicity does not apply to television miniseries depicting plaintiffs in a story about the legendary Motown act the Temptations); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 336 (E.D. Pa. 1996) (dismissing right of publicity claim of former Black Panther leader for use of his name and image in historical movie docudrama and accompanying book and home video); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) ("[T]he first amendment protection usually accorded novels and movies outweighs whatever publicity rights plaintiffs may possess and for this reason their complaints [concerning a fictionalized portrayal of Agatha Christie] must be dismissed."); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 861, 863-72 (1979) (First Amendment barred right of publicity claim based on television film that presented a "fictionalized version" of late actor's life, "depicting the actor's name, likeness and personality without obtaining … prior consent") (Bird, C.J., concurring, with majority of court joining concurrence); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 326 (Cal. App. 1997) (rejecting right of publicity claim based on use of character based on plaintiff in feature film—"Because respondents were creating a fictionalized artistic work, their endeavor is constitutionally protected."); *Restatement (Third) of Unfair Competition*, § 47, cmt. c (1995) ("The right of publicity … is fundamentally constrained by the public and constitutional interest in freedom of expression" and "[u]se of another's identity in a novel, play, or motion picture is … not ordinarily an infringement").

23

of the First Amendment." *Hart*, 717 F.3d at 164 (citing *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 864 (Cal. 1979)).

> **2.** **The GBF Character is a Transformative Parody of Mitchell, and Cannot Give Rise to a Right of Publicity Claim as a Matter of Law**

Here, the GBF character is plainly a transformative, not literal, depiction of Mitchell, and thus cannot give rise to a right of publicity claim as a matter of law.

The California Supreme Court's decision in *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003)—which the Third Circuit cited extensively, and with approval, in *Hart*, 717 F.3d at 160-61, 168-69—is directly on point. There, two musicians, Johnny and Edgar Winter, who both possessed long white hair and albino features, brought suit against a comic book company over images of two villainous half-man, half-worm creatures, both with long white hair and albino features, named Johnny and Edgar Autumn. *Winter*, 30 Cal. 4th at 886. Concluding that "[a]pplication of the [Transformative Use] test to this case is not difficult," the court rejected plaintiff's claims as a matter of law, stating:

> Although the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally. Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized. To the extent the drawings of the Autumn brothers resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature. And the Autumn brothers are but cartoon characters—half-human and half-worm—in a larger story, which is itself quite expressive.

*Winter*, 30 Cal. 4th at 891. The Third Circuit has expressly approved this decision, stating that "*Winter* offers a use that is <u>highly transformative</u> (i.e., fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities)." *Hart*, 717 F.3d at 161 (emphasis added).

As in *Winter*, *The Regular Show* does not depict Mitchell literally; instead, he is merely one of the "raw materials" from which the GBF character—a gigantic floating-head from outer space—is synthesized. As in *Winter*, to the extent the drawings of GBF resemble Mitchell at all, they are "distorted for purposes of lampoon, parody, or caricature." And also as in *Winter*, GBF is "but [a] cartoon character[] … in a larger story, which it itself quite expressive."[12] Accordingly, the GBF character is <u>precisely</u> the type of use that the Third Circuit has already recognized as being "highly transformative," and Mitchell's claims are thus barred by the First Amendment:

---

[12] Also as in *Winter*, Plaintiff's allegation that the GBF character increased sales and profits (Compl. ¶ 25) is irrelevant. *See Winter*, 30 Cal. 4th at 891 (that "defendants were trading on plaintiffs' likenesses and reputations to generate interest in the comic book series and increase sales" is "*irrelevant* to whether the comic books are constitutionally protected," as "[t]he question is whether the work is transformative, not how it is marketed") (emphasis added); *see also, e.g., Hart*, 717 F.3d at 160 n.25 (citing *Winter* with approval in this regard).

**Winter Brothers**

 

**"Autumn Brothers"**



13

**Billy Mitchell**



**"GBF"**



This is not a close call.

While this is more than enough to defeat Mitchell's claims, it bears noting that the use at issue here is even *more* transformative than that in *Winter* because, unlike the Autumn Brothers, the GBF character actually comments on and criticizes the celebrity from which it is drawn.  *See Campbell*, 510 U.S. at 583

---

[13] The above images are taken from Exhibit A to the Petition for Review to the Supreme Court of California in *Winter v. DC Comics*, a true and correct copy of which is annexed as Exhibit F to the Strauss Declaration.  In addition, a black and white version of the above image of the "Autumn Brothers" was included as an appendix to the California Supreme Court's opinion in the official California Reports, 30 Cal. 4th 893.

(song qualified as transformative parody where it "reasonably could be perceived as commenting on the original or criticizing it, to some degree"); *Brownmark Films*, 682 F.3d at 693 (underlying purpose of transformative parody "was to comment on and critique the social phenomenon that is the 'viral video'"); *Cardtoons*, 95 F.3d at 969 ("Cardtoons' parody trading cards receive full protection under the First Amendment. The cards provide social commentary on public figures, major league baseball players …."). [14] Through GBF, *The Regular Show* criticizes perceived characteristics of Mitchell such as an obsession with records, a willingness to use devious tactics to maintain his standing, and an inflated sense of self-worth. Among other things, *The Regular Show* lampoons Mitchell's status as a video-game icon—featuring adoring fans caressing his beard—and his role as "villain" in *The King of Kong*, portraying him as (literally) cartoonishly evil, leading an army of undead surreal villains. (*See supra* at 10-12). The GBF character is thus, on its face, an obvious parody of Mitchell, and of his portrayal in *The King of Kong*. *See, e.g., Campbell*, 510 U.S. at 582 ("The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived."); *Cariou*, 714 F.3d at 707 ("Rather than

---

[14] The *Winter* court held it irrelevant that defendants' comic books ostensibly did "not technically qualify as parody," stating that "[i]t does not matter what precise literary category the work falls into. What matters is whether the work is transformative, not whether it is parody or satire or caricature or serious social commentary or any other specific form of expression." 30 Cal. 4th at 891.

confining our inquiry to [defendant's] explanations of his artworks, we instead examine how the artworks may 'reasonably be perceived' in order to assess their transformative nature.").

In the face of the obviously transformative and surreal nature of *The Regular Show* and the GBF character, Mitchell's allegation that GBF serves to "heighten[] the authenticity and realism of 'The Regular Show'" (Compl. ¶ 37) is ludicrous. Mitchell's allegation concerning "heightened realism" is borrowed almost verbatim from a line in *Hart*[15] and, along with his decision to bring suit in this District despite the lack of any relationship between this action and the state of New Jersey, appears to be based on an ill-conceived belief that *Hart* somehow supports his claim. To the contrary, as explained above, the use of Mitchell as one of the "raw materials" for the creation of the parodic GBF character is precisely the type of use that the *Hart* court recognized as being "highly transformative." While *Hart* ultimately held that the use of *realistic* digital depictions of college football players in a video game was not protected by the First Amendment where neither the literal depictions of the football players nor the context in which they appeared were transformative—"The digital Ryan Hart does what the actual Ryan Hart did while at Rutgers: he plays college football, in digital recreations of college football

_____

[15] *See Hart*, 717 F.3d at 168 ("[I]t seems ludicrous to question whether video game consumers enjoy and, as a result, purchase more EA-produced video games as a result of the heightened realism associated with actual players.") (quotation omitted).

stadiums, filled with all the trappings of a college football game," 717 F.3d at 166—this bears no resemblance to the facts of this case. Billy Mitchell is not a giant floating head from outer space. He does not battle anthromorphic animals and explode into brain goo when defeated. He does not lead an army of undead zombies, living hot-dogs, and gigantic pant-suited women (*see supra* at 10-12) into apocalyptic battle. There is simply no resemblance between the highly realistic digital avatars at issue in *Hart*, which were presented in a context that "d[id] not alter or transform [their] identity in a significant way," 717 F.3d at 166, and the fanciful and surreal GBF character.

Finally, as explained *supra* at 22-23, courts have long held that fictionalized depictions of celebrities are entitled to First Amendment protection. Thus, even if *The Regular Show* had actually featured a realistic, but fictionalized, animated version of Billy Mitchell challenging Mordecai and Rigby to a video game, Mitchell's claims would be barred by the First Amendment. To hold otherwise would be to say that real-life celebrities cannot be depicted as characters in fictional works—if this was true, every Saturday Night Live sketch involving a celebrity impersonation, every *Simpsons*, *South Park*, *Family Guy* or other animated program depicting celebrities or newsmakers, every fictionalized film, television show or novel purportedly set in the real world and featuring real life individuals as characters, would be a violation of the right of publicity. This is not

the law.  But again, in this case transformativeness is even more obvious, because the GBF character is <u>not</u> a literal, realistic depiction of Mitchell, but rather is an obviously transformative parody, in the form of a malevolent, giant floating head from outer space.

"The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire.   Rather, prominence invites creative comment."  *Hart*, 717 F.3d at 154 n.16 (quotation omitted).  If the First Amendment does not apply to bar Mitchell's claims here, it will never apply. Because the GBF character is a paradigmatic "transformative use" of Mitchell's identity, Mitchell's right of publicity claims must be dismissed.[16]

## II.   IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA

Even if Mitchell's claim could somehow survive a motion to dismiss—and it cannot—this Court is not the proper forum.  For the reasons set forth below, in the event that this Court declines to dismiss the Complaint, the action should be transferred to the Central District of California, where the acts giving rise to Mitchell's claim took place.

---

[16]  While Mitchell conclusorily alleges that this action arises out of the "unauthorized advertisement, usage, and sale of products bearing the identity and likeness of Plaintiff" (Compl. ¶ 1), the only "product" that he actually identifies is *The Regular Show* itself, and the only "usage" he identifies is the transformative GBF character.  (*See* Compl. ¶ 2 (describing "Defendants' unauthorized advertisement, usage and sale of products" as "<u>specifically the 'Regular Show'</u>"); *see also* ¶¶ 19, 27, 32.)

**A. Venue is Improper Because None of the Parties Reside in New Jersey, and No Substantial Part of the Underlying Events Occurred in New Jersey**

Venue is only proper in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). This district does not meet any of these criteria and, in any case, the third criterion does not apply because there is at least one other venue, the Central District of California, in which a substantial part of the events giving rise to the claim occurred, and in which Defendants consent to venue and jurisdiction for purposes of this action.

**1. Defendants Do Not All "Reside" in New Jersey (28 U.S.C. § 1391(b)(1))**

For purposes of venue, a corporation is considered to reside in any district in which it is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Accordingly, so long as the Court finds that it lacks personal jurisdiction over <u>even one</u> Defendant, venue is not proper under § 1391(b)(1) (venue is proper if <u>all</u> defendants are residents of the State in which the district is located).

Mitchell bears the burden of demonstrating that either specific or general jurisdiction exists over the Defendants. *See, e.g., Database Am., Inc. v. Bellsouth Advertising & Publ'g Corp.*, 825 F. Supp. 1195, 1208 (D.N.J. 1993). The linchpin of either analysis is whether "minimum contacts with a state are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court there." *Id.* (citing, *inter alia*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Here, Mitchell cannot demonstrate that general or specific jurisdiction exists over <u>any</u> Defendant, much less <u>all</u> of them.

a. **This Court Lacks General Jurisdiction Over Defendants**

General jurisdiction arises only under very limited circumstances, not present here. As the Supreme Court has recently recognized, general jurisdiction is proper over a corporation only where "the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2853-54 (2011); *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (same). For a corporation, "the place of incorporation and principal place of business are 'paradig[m] … bases for general jurisdiction.'" *Daimler AG*, 134 S. Ct. at 760 (citation omitted). Only in an "exceptional" case might a corporation's operations in a forum other than its formal place of incorporation or principal place of business "be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19. As the Supreme Court held in *Daimler AG*,

even a formulation that would "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business" would be "unacceptably grasping." *Id.* at 760-61 (quotation omitted).

None of the Defendants are at "home" in New Jersey. Not only are they not domiciled in New Jersey, they are not even registered to do business in the state, do not have any offices in New Jersey, and do not maintain assets, bank accounts or property in New Jersey. (*Supra* at 14-15). In light of the Supreme Court's recent pronouncements, the mere fact that The Cartoon Network channel is available nationwide does not mean that Defendants are subject to nationwide jurisdiction. *See Corporate Trade, Inc. v. Golf Channel*, No. 12-2421, 2012 U.S. Dist. LEXIS 189238, at *10 (D.N.J. Oct. 11, 2012) ("The single contention that Golf Channel is available for viewing in New Jersey is not sufficient to show that Golf Channel has 'continuous and systematic contacts' in this district for purposes of general jurisdiction."); *cf. Goodyear*, 131 S.Ct. at 2855 (flow of a defendant's products into the forum may be relevant to the issue of specific, but not general, jurisdiction).

Accordingly, Mitchell does not even begin to approach the exceedingly high threshold of minimum contacts necessary for the exercise of general jurisdiction.

b.    **This Court Lacks Specific Jurisdiction Over Defendants**

Specific personal jurisdiction requires that: (1) the defendant purposefully direct its activities at the forum; and (2) the claim directly arises out of or relates to the defendant's activities in the forum.  If these requirements are met, a court may also consider whether the exercise of jurisdiction comports with fair play and substantial justice.  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).  Here, the mere fact that *The Regular Show* aired in New Jersey (along with 49 other states) does not satisfy either the purposeful direction or "arising out of" requirements for specific jurisdiction.

First, courts have declined to exercise specific jurisdiction over out-of-state television companies based on the mere fact that a program was broadcast in the forum, holding that nationwide broadcasts do not give rise to the necessary "purposeful direction" of activities to the forum state.  "Other courts facing similar facts have generally held that a nationwide broadcast that can be viewed in the forum is not sufficient to establish personal jurisdiction." *Corporate Trade, Inc.*, 2012 U.S. Dist. LEXIS 189238, at *8 (finding no purposeful direction since defendant Golf Channel's network was broadcast nationwide, merely including New Jersey); *see also, e.g., Outdoor Channel, Inc. v. Performance One Media, LLC*, 826 F. Supp. 2d 1271, 1280-82 (N.D. Okla. 2011) (no specific jurisdiction where defendants' contracts for nationwide broadcast did not show that it had

purposefully directed its activities specifically towards Oklahoma); *Annie Oakley Enters. v. Sunset Tan Corporate & Consulting, LLC*, 703 F. Supp. 2d 881, 893 (N.D. Ind. 2010) ("[A]s a matter of law, the national broadcast of a television program does not give rise to personal jurisdiction in every state."); *Busch v. Viacom Int'l, Inc.*, 477 F. Supp. 2d 764, 772-73 (N.D. Tex. 2007) (no specific jurisdiction in misappropriation claim where the allegedly infringing episode of *The Daily Show* "was not directed at viewers of *The Daily Show* in Texas, but was broadcast nationwide"); *Auto Channel, Inc. v. Speedvision Network, LLC*, 995 F. Supp. 761, 764-66 (W.D. Ky. 1997) (holding mere fact that Speedvision's programming is available to cable subscribers in Kentucky is insufficient to support personal jurisdiction).  Similarly, here, because *The Regular Show* (like other Cartoon Network programming) airs nationwide, the mere fact that the program may be available in New Jersey does not constitute the requisite "purposeful direction" at this state, and cannot give rise to personal jurisdiction. (Vigilante Decl. ¶ 5).

Second, Mitchell's claim does not "arise out of" or "relate to" any forum-related activities.  The Third Circuit has held that, to satisfy this requirement, at a minimum the defendant's forum-related activities must be a "but-for" cause of the claim, *i.e.*, the plaintiff's claim would not have arisen in the absence of the defendant's contacts.  *See O'Connor*, 496 F.3d at 322 ("[A]lthough the analysis

may begin with but-for causation it cannot end there …. But-for causation cannot be the sole measure of relatedness because it is vastly overinclusive….").  But that *The Regular Show* may have aired in New Jersey—in addition to 49 other states— is  not a "but-for" cause of Mitchell's claim.  No part of the creation of the show or the allegedly infringing character took place in New Jersey—all of this happened in California.  (Vigilante Decl. ¶¶ 6, 13-17).  Nor did Mitchell incur any harm in New Jersey; in right of publicity and similar intellectual-property related claims, a plaintiff's alleged harm is felt in his state of residence—which here is Florida, not New Jersey.  (*Supra* at 14).  *See, e.g., Penguin Group (USA) Inc. v. Am. Buddha*, 640 F.3d 497, 500 (2d Cir. 2011) (for purposes of personal jurisdiction, situs of injury in copyright infringement action is copyright holder's principal place of business); *Love v. Associated Newspapers*, 611 F.3d 601, 609 n.4 (9th Cir. 2010) (in right of publicity claim, finding no personal jurisdiction over defendants in California where, *inter alia*, plaintiff was "a citizen not of California but of Nevada");  *Horne v. Adolph Coors Co.*, 684 F.2d 255, 259 (3d Cir. 1982) (for purposes of personal jurisdiction, "insofar as the situs of the property damaged by the alleged wrongdoing is a concern, both a state trade secret and a patent should be deemed to have their fictional situs at the residence of the owner").[17]  Even if

---

[17] Relatedly, in cases involving allegedly intentional torts, a plaintiff can establish jurisdiction by demonstrating, *inter alia*, that the defendant knew the brunt of plaintiff's injury would be felt in the forum.  *See, e.g., IMO Indus. v. Kiekert AG*,

*The Regular Show* had never been broadcast in New Jersey, the nature of Mitchell's claims would be no different—in these circumstances, specific jurisdiction cannot lie.

c.    **The Court Cannot Reasonably Exercise Jurisdiction Over Defendants**

Because Mitchell cannot establish <u>either</u> general or specific jurisdiction over <u>all</u> Defendants, the Court need not consider whether the exercise of jurisdiction is reasonable and comports with "traditional notions of fair play and substantial justice." *See, e.g., O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) (even if a plaintiff proves that the requisite minimum contacts with the forum exist, a defendant may demonstrate that the presence of other considerations renders jurisdiction unreasonable). Nonetheless, if the Court were to do so, the Supreme Court has identified several factors that may be considered in balancing jurisdictional reasonableness, including "the burden on the defendant, the forum State's interest in adjudicating the dispute, [and] the plaintiff's interest in obtaining convenient and effective relief…." *Id.* at 324 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

---

155 F.3d 254, 261 (3d Cir. 1998) (describing and applying the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984)); *Scott v. Lackey*, 587 F. App'x 712, 716 (3d Cir. 2014). As explained above, any harm suffered by Mitchell was felt in Florida, not New Jersey.

Here, each of these factors weighs against the exercise of jurisdiction. With respect to the burden on Defendants in appearing, the alleged ties between Defendants and New Jersey are so tenuous—indeed, nonexistent—that it would violate federal due process to force Defendants to defend themselves in this forum. *See generally Int'l Shoe Co. v. Washington*, 326 U.S. 310, 324 (1945) (exercise of personal jurisdiction cannot offend traditional notions of fair play and substantial justice). Further, the state of New Jersey simply has no interest in adjudicating this dispute, as <u>none</u> of the parties, including Plaintiff Mitchell, are residents of the state of New Jersey, and Mitchell has thus suffered no harm in New Jersey. (*Supra* at 36). Finally, while Mitchell obviously has an interest in obtaining relief, given that he is a Florida resident (and thus any harm was felt in that state), he has no interest in obtaining that relief <u>in New Jersey</u>.

2.      **No "Substantial Part of the Events or Omissions Giving Rise to the Claim" Occurred in New Jersey (28 U.S.C. § 1391(b)(2))**

Nor is venue proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because no "substantial" part of the events giving rise to Mitchell's claim occurred in New Jersey. "The test for determining venue [under § 1391(b)(2)] is not the defendants 'contacts' with a particular district, but rather the location of those events or omissions giving rise to the claim…." *Cottman Transmission Sys. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). "Events or omissions that might only

have some tangential connection with the dispute in litigation are not enough. Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.*

Here, any alleged misappropriation of Plaintiff's likeness occurred primarily in California, where the GBF character was conceived and created. (*See* Vigilante Decl. ¶¶ 6, 12-17). Any harm was felt in Florida, where Mitchell resides. (*See supra* at 36). The only conceivable relationship between this action and New Jersey is that *The Regular Show* aired in New Jersey, just as it aired throughout the country and internationally. (Vigilante Decl. ¶ 5). This alone cannot suffice to establish the necessary "substantiality," where the state of New Jersey has no other relationship to the parties or this action, and where Mitchell can offer no facts distinguishing New Jersey from any of the myriad other locations where the program aired. *See Thayil v. Cowell*, No. 10-3200-CV-S-RED, 2011 U.S. Dist. LEXIS 6798, at *5-8 (W.D. Mo. Jan. 25, 2011) (venue improper where, although four at-issue television shows were broadcast in the forum state, the complaint did not allege that they were created in the forum state); *Mullis v. Wright*, No. 89-2379-OG, 1990 U.S. Dist. LEXIS 1706, at *6 (D.D.C. Feb. 9, 1990) (venue not appropriate under § 1391(b) where "[t]he only sense in which the plaintiff's claims arose in D.C. is that Miami Vice was broadcasted into Washington D.C. However, the show was broadcasted into every other venue in the country as well."); *Cf.*

*Kelly-Brown v. Winfrey*, No. 11-4360, 2011 U.S. Dist. LEXIS 127213, at *10 (D.N.J. Nov. 3, 2011) ("Even though Plaintiffs have argued that substantial events underlying the suit occurred in New Jersey because the Magazine, television show and websites bearing the Mark received distribution in New Jersey, this connection to the facts does not place New Jersey in a superior position to the other 49 states in which Plaintiffs contend infringement also occurred in the same manner.").

### B. Even if Venue is Not Improper, This Case Should be Transferred Pursuant to 28 U.S.C. § 1404(a) Because the Parties and the Dispute Have No Connection to New Jersey

In the alternative to dismissal, this Court has the discretion—and compelling grounds—to transfer this action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a), which provides for transfer "[f]or the convenience of the parties and witnesses, [and] in the interest of justice … to any other district or division where [the case] might have been brought,"[18] because this case has <u>no</u> connection to New Jersey whatsoever.  The parties are not residents of New Jersey, New Jersey is not where Mitchell's claims arose, and none of the witnesses or documents are located in New Jersey.

---

[18] As an initial matter, there can be no dispute that this action could have been brought in the Central District of California, where Defendant CNS, Inc. is located and created the allegedly infringing character.  *See* 28 U.S.C. § 1392(b)(2) (venue is appropriate where "a substantial part of the events" giving rise to plaintiff's claim occurred).

In deciding whether to transfer, courts consider a number of private and public interests set forth by the Third Circuit in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995). These are:

**<u>Private Interest Factors</u>**
    (i)      Plaintiff's forum preference as manifested in the original choice;
    (ii)     Defendants' preference;
    (iii)    Whether the claim arose elsewhere;
    (iv)    Convenience of the parties as indicated by their relative physical and financial condition;
    (v)     Convenience of the witnesses, to the extent that the witnesses may be unavailable for trial in one of the fora; and
    (vi)    Location of books and records, to the extent that files could not be produced in the alternative forum.

**<u>Public Interest Factors</u>**
    (i)      Enforceability of the judgment;
    (ii)     Practical considerations that could make the trial easy, expeditious or inexpensive;
    (iii)    Relative administrative difficulty in the two fora resulting from court congestion;
    (iv)    Local interest in deciding local controversies at home;
    (v)     Public policies of the fora; and
    (vi)    Familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879. These factors overwhelmingly favor transfer to the Central District of California.

1.   **The Private Factors Favor Transfer**

a.   **Factors 1 and 2 (the Parties' Forum Preferences) Favor Transfer Because Neither Plaintiff, nor the Action, Has Any Connection to New Jersey**

Though the plaintiff's forum choice is typically afforded significant weight, plaintiff's choice deserves less deference when he has not chosen his home forum, *see, e.g., Lony v. E.I. DuPont de Nemours & Co.*, 886 F.2d 628, 633 (3d Cir. 1989), and even less deference "when the chosen forum has little connection to the facts underlying the claim." *Kelly-Brown v. Winfrey*, 2011 U.S. Dist. LEXIS 127213, at *9-10 (D.N.J. Nov. 3, 2011); *see also, e.g., Wm. H. McGee & Co. v. United Arab Shipping Co.*, 6 F. Supp. 2d 283, 290 (D.N.J. 1997) ("[D]eference is curbed when a plaintiff's choice of forum has little connection with the operative facts of the lawsuit."); *LG Elecs. Inc. v. First Int'l Computer*, 138 F. Supp. 2d 574, 590 (D.N.J. 2001) (same). In such cases, a plaintiff's choice of forum "is at a high risk of being overridden…." *Mendoza v. U.S. Custom and Border Prot.*, No. 05-6017, 2007 U.S. Dist. LEXIS 18963, at *3 (D.N.J. Mar. 19, 2007).

Here, Mitchell is a Florida resident—New Jersey is not his home forum. Further, New Jersey has no connection to the facts underlying Mitchell's claims. None of the Defendants are based, have employees,[19] or are registered to do business in New Jersey, and CNS, Inc.—the true defendant in interest, responsible

---

[19] Other than two TBS, Inc. employees who work from their homes in New Jersey, neither of whom performed any work on *The Regular Show* in any capacity. (Vigilante Decl. ¶ 10).

for the creation of the allegedly infringing character—maintains its principal operations in California, where all of its full-time employees are located. Indeed, the GBF character was created for CNS, Inc. by individuals working out of its California offices. (*See supra* at 14-15). As such, New Jersey has no more connection to this case than any other state in the United States where *The Regular Show* airs, and considerably less connection than California, Defendants' preferred choice of forum, and where all of its relevant witnesses and documents are located.

In cases like this, courts consistently hold that the "forum preference" factors <u>favor</u> transfer. Two recent decisions in this District, *Kelly-Brown* and *Virag, S.R.L.*, are directly on point. In *Kelly-Brown*, as here, plaintiffs were citizens of Florida, with no connection to this state other than their choice of a New Jersey attorney to represent them. Plaintiffs argued that substantial events occurred in New Jersey because, as here, an allegedly infringing television show (as well as a magazine and websites) were distributed in New Jersey, but as the Court recognized "this connection to the facts does not place New Jersey in a superior position to the other 48 states in which Plaintiffs contend infringement also occurred in the same manner." 2011 U.S. Dist. LEXIS 127213, at *9-10. In these circumstances, the Court held, "Plaintiffs' choice of forum carries little sway … when balanced against Defendants' preference to transfer this case" to a forum

where the defendants had offices and which had a greater connection to the facts of the case. *Id.* at \*10.

Similarly, in *Virag, S.R.L. L. v. Sony Computer Entm't Am. LLC*, the Court held that the action should be transferred to the defendants' requested forum where the plaintiff did not reside in New Jersey, and the only alleged connection between this forum and the claims was that the allegedly infringing video games were sold *nationwide*. No. 14-4786 (KM), 2015 U.S. Dist. LEXIS 39910, at \*13-14 (D.N.J. Mar. 30, 2015). By contrast, a "substantial part of Plaintiff's claims arose in the Northern District of California"—the defendants' preferred forum, and from where the allegedly infringing games were marketed and distributed. *Id.* at \*14-16. *See also, e.g., LG Elecs.*, 138 F. Supp. 2d at 589 (transferring action where plaintiff did not reside in New Jersey, New Jersey was not the location of the operative facts, and California, the defendants' preferred forum, was a center of gravity of the allegedly infringing activity); *Wm. H. McGee & Co.*, 6 F. Supp. 2d at 290 (transferring action where "the facts underlying the litigation appear to have a more significant nexus to Louisiana"); *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 481-83 (D.N.J. 1993) (transferring action where plaintiff did not reside in New Jersey and, while allegedly infringing products were sold nationwide (including in New Jersey), the operative facts were not centered in New Jersey).

Accordingly, because Mitchell is not a New Jersey resident and his claims have no connection to this forum, but Defendants' choice of forum does have a strong connection to this forum (and is where all relevant witnesses and documents are located), these factors strongly favor transfer.

      b.     **Factor 3 (Where the Claim Arose) Favors Transfer**

As explained above, the facts central to this litigation did not take place in New Jersey.  In fact, the Central District of California has the strongest connection of any forum to the facts of this case, because that is where all of CNS, Inc.'s full-time employees are located, where the allegedly infringing character was conceived, and where the allegedly infringing *The Regular Show* programs were created and produced.  *See, e.g., Kelly-Brown*, 2011 U.S. 127213, at *10-11 (this factor favored transfer where New Jersey was just one of 50 states in which allegedly infringing materials were distributed, and thus was not the "locus" of the alleged infringement); *Ricoh*, 817 F. Supp. at 482-83 (transferring action to Minnesota, where allegedly infringing products were designed, developed, and manufactured, and stating that New Jersey was not the "center of gravity" for the allegedly infringing activities just because the product was sold nationwide).

      c.     **Factor 4 (Convenience of the Parties) Favors Transfer**

CNS, Inc.'s offices, potential witnesses and documents are all located within the Central District of California.  In particular, since the allegedly infringing *The*

*Regular Show* program and the GBF character were created entirely by individuals in California, to the extent any discovery in this action is necessary it will be centered in California. (*Supra* at 14-15). Further, none of the Defendants have any relevant employees, witnesses or documents in New Jersey. (*Id.*, Vigilante Decl. ¶¶ 10, 16-17).

Mitchell, on the other hand, is "located in Florida, and apart from [his] choice of a New Jersey attorney, [has] demonstrated no personal convenience that would support keeping this case in New Jersey." *Kelly-Brown*, 2011 U.S. Dist. LEXIS 127213, at *11. By Mitchell's own admission he is a successful celebrity (Compl. ¶ 17), and he has already indicated a willingness and ability to litigate this action far from his home state. Accordingly, this factor favors transfer.

        d.    **Factors 5 (Availability of Witnesses) and 6 (Location of Documents) Favor Transfer or Are Neutral**

As explained above, relevant witnesses and documents in this matter are located in California; no witnesses or documents are located in New Jersey. The Third Circuit has stated that these factors are relevant only to the extent that witnesses or documents are unavailable in one of the fora. (*See supra* at 41). While Defendants are not currently aware of any witnesses or documents that are unavailable in either forum, to the extent that testimony from any former CNS, Inc. employee is required, that testimony is much more likely to be capable of being compelled in the Central District of California. By contrast, there are <u>no</u> relevant

witnesses or documents in New Jersey.  *See Virag, S.R.L.*, 2015 U.S. Dist. LEXIS 39910, at *18-19 (transferring action where any relevant witnesses resided at defendant's headquarters in California, or elsewhere in California); *Kelly-Brown*, 2011 U.S. Dist. LEXIS 127213, at *13-14 (transferring action where "[t]here is no indication that the sources of proof related to Plaintiffs' claims are located in New Jersey or have a particular connection to this state").

### 2.    The Public Factors Similarly Favor Transfer

Finally, while the majority of the public interest factors identified in *Jumara* are either neutral or inapplicable here, *see, e.g., LG Elecs.*, 138 F. Supp. 2d at 587 ("The above list of factors is merely a guide, and not all the factors may be relevant or determinative in each case."), those that do apply strongly weigh in favor of transfer.

<u>First</u>, with respect to local interest in deciding local controversies at home, courts recognize that states have a strong interest in regulating businesses that have a principal place of business there, and in adjudicating disputes where the locus of culpable conduct occurred there.  *See, e.g., Ricoh*, 817 F. Supp. at 486 (transferring action to Minnesota, where defendant maintained its principal place of business and where the allegedly infringing product was designed, developed and manufactured); *see also Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 48 (3d Cir. 1988) ("In evaluating the public interest factors the district court must consider the

locus of the alleged culpable conduct … and the connection of that conduct to plaintiff's chosen forum.") (quotation omitted).  As explained *supra* at 15, because the allegedly infringing character was created in California, where all of CNS, Inc.'s full-time employees are located, California has a strong local interest in resolving this dispute, while New Jersey has none.

Again, *Virag, S.R.L.* is directly on point.  Because there, as here, the allegedly infringing products were distributed nationwide, the court concluded that "New Jersey lacks a connection to the alleged infringement that is any more significant than the other states where that same activity also occurs."  *Id.* at *19-20.  Because there, as here, "no party maintains offices, employees, relevant documents, witnesses, or even a principal place of business in New Jersey," the court concluded that "<u>New Jersey maintains scant interest, public or otherwise, in adjudicating this case.</u>"  *Id.* at *20.  And because there, as here, "[o]f the two alternatives, solely California maintains a direct connection, and a strong interest, in this case," the Court concluded that "the public interest factors also tip the scales in favor of transfer."  *Id.*

<u>Second</u>, practical considerations relating to the litigation of the case favor transfer in light of Defendants' argument, *supra* at 32-38, that there is no personal jurisdiction over Defendants.  There is no need to actually resolve the personal jurisdiction question to transfer on these grounds—"The Third Circuit has held that

where there is a bona fide dispute over the existence of *in personam* jurisdiction, the interests of justice are furthered by transfer of the action to another district in which the action could have clearly been brought." *Kelly-Brown*, 2011 U.S. Dist. LEXIS 127213, at *15 (citing *Schwilm v. Holbrook*, 661 F.2d 12, 16 (3d Cir. 1981)). Accordingly, in *Kelly-Brown*, the court granted defendants' transfer motion where it "face[d] precisely the type of personal jurisdiction issue which may be avoided by transfer of the action to a venue where many Defendants are located." *Id.* at *15-16.

Because there is simply no connection between New Jersey and either the alleged wrongdoing or any of the parties involved in this action, and both the private and public interest factors overwhelmingly favor transfer, to the extent it is not dismissed for failure to state a claim, this action should be transferred to the Central District of California.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that Plaintiff's Complaint be dismissed with prejudice in its entirety or, in the alternative, that this action be transferred to the Central District of California.

Dated:      New York, New York
            September 28, 2015


                          LOEB & LOEB LLP


                          By: /s Jonathan Strauss
                          _____
                              Jonathan Neil Strauss (JS1090)
                              Christian D. Carbone (*pro hac vice*)
                              345 Park Avenue
                              New York, New York 10154-1895
                              (212) 407-4000


                              *Attorneys for Defendants*