UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BILLY MITCHELL,                                )
                                               )        Civil Action No. 3:15-cv-05668-AET-LHG
                                               )
                    Plaintiffs,                )
                                               )
vs.                                            )
                                               )
THE CARTOON NETWORK, INC., a                   )
New York Corp., CARTOON NETWORK               )
STUDIOS, INC.,  a Georgia Corporation,         )
TURNER BROADCASTING SYSTEM,                    )
INC., a Georgia Corporation, John Does 1       )
through 10, fictitious designations,           )
                                               )
                    Defendants.                )

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS OR, IN THE ALTERNATIVE, TRANSFER VENUE

---

BALLARD & DRAGAN
Attorneys at law
Liberty Court, Suite 1200
260 Highway 202/31
Flemington, NJ  08822
(908) 806-3171
Attorneys for Plaintiffs

Robert A. Ballard, Jr., Esquire
Attorney ID# 020911984
 On the Brief

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS                                        1

LEGAL ARGUMENT

I. VENUE IS PROPER UNDER 28 U.S.C. §1391(b)(1)      4

A. VENUE IS PROPER UNDER 28 U.S.C. §1391(b)(1)
BECAUSE THE DEFENDANTS "RESIDE" IN NEW JERSEY       5

B. VENUE IS PROPER UNDER 28 U.S.C. §1391(b)(2)
BECAUSE A SUBSTANTIAL PART OF THE EVENTS GIVING
RISE TO THIS CLAIM OCCURRED IN THE SATE
OF NEW JERSEY                                            11

II. VENUE SHOULD NOT BE TRANSFERRED
PURSUANT TO 28 U.S.C. §1404(a)                          12

A. PRIVATE FACTORS                                      13

B. PUBLIC FACTORS                                       15

III. DEFENDANTS' MOTION TO DISMISS SHOULD
BE DENIED AS PLAINTIFF STATES A VALID CLAIM
AS A MATTER OF LAW                                      16


CONCLUSION                                              25

## TABLE OF CITATIONS

*Cases*                                                          Page

Al-Ghena Int'l Corp. v. Radwan,
957 F. Supp. 2d 511 (D.N.J. 2013)                       4,5,7,8,12

Atl. Marine Constr. Co. v. United States Dist. Court,    4,5
134 S. Ct. 568 (2013)

Canessa v. J. I. Kislak, Inc.,
97 N.J. Super. 327, 235 A.2d 62 (N.J. Super. L., 1967)  17,18

Eason v. Linden Avionics, Inc.,
706 F. Supp. 311 (D.N.J. 1989)                          6

Hart v. Electronic Arts, Inc.,
717 F.3d 141 (3rd Cir., 2013)                           16, 19-25

Jumara v. State Farm Ins. Co.,
55 F.3d 873 (3d Cir. Pa. 1995)                          12,13,15

No Doubt v. Activision Publishing, Inc.,
192 Cal. App. 4th 1018, 122 Cal. Rptr. 3d 397 (2011)   22,23

O'Connor v. Sandy Lane Hotel Co.,
496 F.3d 312 (3d Cir. Pa. 2007)                         6,8,10

Provident Nat'l Bank v. California
Federal Sav. & Loan Asso.,
819 F.2d 434 (3d Cir. Pa. 1987)                         6

Rappoport v. Steven Spielberg, Inc.,
16 F. Supp. 2d 481 (D.N.J. 1998)                        13

Ricoh Co. v. Honeywell, Inc.,
817 F. Supp. 473 (D.N.J. 1993                           13

Shore Slurry Seal v. CMI Corp.,
964 F. Supp. 152 (D.N.J. 1997)                          14

Tristar Prods. v. SAS Group, Inc.,
2009 U.S. Dist. LEXIS 94592 (D.N.J. Sept. 9, 2009)     9,10

<u>Walden v. Fiore</u>,
134 <u>S. Ct.</u> 1115 (2014)                                    8

<u>Wm. H. McGee & Co. v. United Arab Shipping Co.</u>,
6 <u>F. Supp. 2d</u> 283 (D.N.J. 1997)                          14,15


**<u>STATUTES</u>**

28 U.S.C. §1406(a)                                          4

28 U.S.C. §1391(b)                                          5

28 U.S.C. §1391(c)                                          5

28 U.S.C. §1404(a)                                          12

## STATEMENT OF FACTS

For purposes of this motion, the facts contained in Plaintiff's complaint are incorporated herein. As indicated in the Declaration of Billy Mitchell, those facts are declared true and accurate by him, and certified as truthful. To supplement those facts, the following additional facts are certified by Mr. Mitchell in his declaration as well.

Specifically, Mr. Mitchell has spent considerable time, effort and talent to create and solidify the brand known as "Billy Mitchell". As indicated in the complaint, he has a particular style of dress, style of appearance, including his hair and beard, and style of speaking, that is uniquely his. There is very little doubt within the gaming industry, and in his mind, that the character in the Regular Show known as Garrett Bobby Ferguson, is indeed, Billy Mitchell.

Further, the Defendants in their motion, candidly admit that the Garrett Bobby Ferguson ("GBF") character is based upon Mr. Mitchell. As Mr. Mitchell indicates, he filed this lawsuit because of that direct rip off of his image and likeness, and the fact that the character places him in a very unfavorable light.

As Mr. Mitchell attests, although the Defendants do admit that the GBF character is based upon Billy Mitchell, this should be of no surprise to anyone familiar with the show, the gaming industry or Mr. Mitchell. A simple google search of GBF reveals, in the image portion, photos of Mr. Mitchell. Attached to Plaintiff's Declaration as Exhibit "A", is a print out of such a simple google search, which contains direct actual images of Billy Mitchell, which are circled in red.

## AS TO JURISDICTION

This litigation has been in the District Court of New Jersey for several reasons. New Jersey is ripe with individuals and businesses in the gaming industry, which includes video games, arcade games and pinball games amongst other activities. (See Mitchell Declaration). Mr. Mitchell makes

1

regular visits to New Jersey for his business, and has made many public appearances there. There are several significant arcade businesses and individuals in that state, and the Plaintiff does much business as "Billy Mitchell" in New Jersey.

None of the named Defendants have their corporate offices in California. As noted in the complaint, the offices and registered agents of the Defendants are as follows:

- Upon information and belief, Defendant, The Cartoon Network, Inc., (hereinafter "CN"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 75 Rockefeller Plaza, New York, New York.

- Upon information and belief, Defendant, Cartoon Network Studios, Inc., (hereinafter "CNS") is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located at One CNN Center, Atlanta, Georgia.

- Upon information and belief, Defendant, Turner Broadcasting System, Inc., (hereinafter "TBS"), is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located at One CNN Center, Atlanta, Georgia.

Mr. Mitchell lives in Florida, which has relative close proximity to New Jersey. Since the Defendants are residents of Georgia and New York, New Jersey is an extremely convenient forum for all of the parties in this case. If this matter is moved to California, it would create significant hardship on th Plaintiff to fly across country and meet with a new attorney in California willing to handle this case, all for the convenience of individuals that are not named parties in this case, who happen to do their work in California.

2

Further, the Cartoon Network does do significant business in the State of New Jersey, and not only through the broadcast of the Regular Show on cable and satellite networks. As is seen in the attached Exhibit "B", the Regular Show, and the Defendants, are profiting from merchandise from their show, and advertising, and offering for sale, Regular Show products through the internet. One of the drop down states for check out is New Jersey, as demonstrated in the annexed Exhibit "B". Clearly, the Defendants, and all of them, are selling product, advertising product, and making profits in the State of New Jersey from the Regular Show. (See Mitchell Declaration).

## AS TO DEFENDANTS' MOTION TO DISMISS

As explained in Billy Mitchell's Declaration, the character in the Regular Show known as Garrett Bobby Ferguson ("GBF") is a direct rip off of his image and likeness, only in a very disparaging way. The actions of this character, which Mr. Mitchell has personally observed, make him look like some sort of monster, or creature, with no heart or decency. This is simply not Billy Mitchell, and places him in a very unfavorable light. However, as is demonstrated in the google search which is attached, GBF is Billy Mitchell, with a monster like attitude. This type of direct rip off of his image and likeness, done without his authorization, should not be condoned by the Courts.

## I.    VENUE IS PROPER UNDER 28 U.S.C. § 1391(b)(1)

The District Courts have the authority to transfer a case that was brought in the wrong venue pursuant to 28 U.S.C. § 1406(a), which states: "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." However, "[d]ismissal is considered to be a harsh remedy ... and transfer of venue to another district court in which the action could originally have been brought, is the preferred remedy." Al-Ghena Int'l Corp. v. Radwan, 957 F. Supp. 2d 511, 525 (D.N.J. 2013)(citing NCR Credit Corp. v. Ye Seekers Horizon, 17 F. Supp. 2d 317, 319) (D.N.J. 1998); (Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962);(United States v. Berkowitz, 328 F.2d 358, 361 (3d Cir. 1964)).

"[The] question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. §1391." Atl. Marine Constr. Co. v. United States Dist. Court, 134 S. Ct. 568, 577 (2013).

28 U.S.C. § 1391 states in relevant part:

> (b) A civil action may be brought in—
>
>> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located
>>
>> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>>
>> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

"The movant has the burden of demonstrating that venue is improper." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 519 (citing Myers v. Am. Dental Ass'n, 695 F.2d 716, 724-25 (3d Cir. 1982)). When deciding whether venue is proper "[t]he court generally accepts the allegations in

the pleadings as true and draws all reasonable inferences and resolves all factual conflicts in the plaintiff's favor." Id. (*citing* Bockman v. First Am. Marketing Corp., 459 Fed. App'x 157, 158 n.1 (3d Cir. 2012)). "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in §1391(b)." Atl. Marine Constr. Co., 134 S.Ct. at 577. In the case at bar, the State of New Jersey is the proper venue because it is a State in which all of the Defendants "reside" under 28 U.S.C. § 1391(b)(1), and it is where a substantial part of the events giving rise to the claim occurred under 28 U.S.C. § 1391(b)(2).

### A.VENUE IS PROPER UNDER 28 U.S.C. 1391(b)(1) BECAUSE THE DEFENDANTS "RESIDE" IN NEW JERSEY

This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(1) because a corporation "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction…" 28 U.S.C. § 1391(c)(2). "To assess whether it has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 528 (D.N.J. 2013)(*citing* IMO Indus., Inc. v. Kiekert, AG, 155 F.3d 254, 259 (3d Cir. 1998)). "First, the court is required to use the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. Second, the court must apply the principles of due process under the federal Constitution." Id. (*citing* Fed. R. Civ. P. 4(k)); (WorldScape, Inc. v. Sails Capital Mgmt., Civ. 10-4207, 2011 U.S. Dist. LEXIS 86643 (D.N.J. Aug. 5, 2011)). However, "[i]n New Jersey, the  first step collapses into the second because 'New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution.'" Id. (*citing* Miller Yacht Sales, 384 F.3d 93 96 (3d Cir. 2004) (*citing* N.J. Ct. R. 4:4-4(c)).

"[P]ersonal jurisdiction over a non-resident defendant is proper in this Court if the defendant has 'certain minimum contacts with [New Jersey] such that the maintenance of the suit

does not offend traditional notions of fair play and substantial justice.'" Id. (*citing* Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987) (*quoting* International Shoe Co. v. Washington, 326 U.S. 310 (1945)). "The nature of these contacts must be such that the defendant should be reasonably able to anticipate being haled into court in the forum state." Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d 434, 437 (3d Cir. Pa. 1987)(*citing* World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "New Jersey has adopted an especially permissive approach to minimum contacts analysis: 'jurisdiction has been exercised wherever possible when a liberal and indulgent view of the facts reasonably support the presence of the flexible concepts of 'fair play and substantial justice.'" Eason v. Linden Avionics, Inc., 706 F. Supp. 311, 323 (D.N.J. 1989) (*citing* Ketcham v. Charles R. Lister International, Inc., 167 N.J. Super. 5, 7 (1979)). New Jersey courts "allow out-of-state service to the uttermost limits permitted by the United States Constitution." Id. (*citing* Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971)). "In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus upon the "relationship among the defendant, the forum and the litigation." Id. at 320 (*citing* Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (*quoting* Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). "The contacts between the defendant and the forum must be judged 'in light of the claim.'" Id. (*quoting* Keeton, 465 U.S. at 775). "[T]he existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 324 (3d Cir. Pa. 2007)(*citing* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 477 (1985))(*See also* Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 207 (3d Cir. 1998) (noting that if minimum contacts are present, then jurisdiction will be unreasonable only

in "rare cases"); (Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993) ("The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy")).

Specifically, there are two kinds of personal jurisdiction that would allow this Court to hear a case involving the foreign Defendants: general and specific. Al-Ghena Int'l Corp., 957 F. Supp. 2d at 528 (*citing* Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414-415 (1984)).

First, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014)(*citing* Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846 (2011); (Helicopteros, 466 U. S. at 414). In Daimler, the United States Supreme Court explained that in all but the most exceptional circumstances, a corporation is "'at home' only in the two 'paradigm . . . bases for general jurisdiction': its state of incorporation and its principal place of business." Farber v. Tennant Truck Lines, Inc., 84 F. Supp. 3d 421, 429 (E.D. Pa. 2015)(*citing* Daimler, 134 S.Ct. at 760-61 & n.19). "Of course, the Court did not 'foreclose the possibility that in an exceptional case, a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State.'" Id. at 430 (*citing* Daimler, 134 S.Ct. at 761).

Second, "specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiff's claims." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 528 (*citing* Helicopteros, 466 U.S. at 413-14). The determination as to "whether a forum State may assert specific

jurisdiction over a nonresident defendant focuses on 'the relationship among the defendant, the forum, and the litigation.'" Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014)(*quoting* Keeton, 465 U.S. 770, 775 (1984)). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Id. at 1123 (*citing* Burger King, 471 U. S. at 475).

The inquiry as to whether specific jurisdiction exists has three parts: 1) the defendant must have purposefully directed its activities at the forum; 2) the litigation must arise out of or relate to at least one of those activities; and 3) if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice. O'Connor, 496 F.3d at 317 (*citing* Burger King, 471 U.S. at 476); (Int'l Shoe, 326 U.S. at 320). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State - either by the defendant in person or through an agent, goods, mail, or some other means - is certainly a relevant contact." Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014)(*citing* Burger King, 471 U.S. at 476); (*See also* Keeton. 465 U.S. at 773-774). "[S]pecific jurisdiction is not defeated merely because the bulk of harm occurred outside the forum." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 528 (*citing* Keeton, 465 U.S. at 780). "But what is necessary is a deliberate targeting of the forum." O'Connor, 496 F.3d at 317. "A single act may satisfy the minimum contacts test if it creates a substantial connection with the forum." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 528 (*citing* Burger King, 471 U.S. at 476 n. 18).

In this case, the first prong of the specific jurisdiction analysis is met by the fact that the Defendants not only broadcast "The Regular Show" in the State of New Jersey, but also have an interactive website on which "The Regular Show" products can be purchased by New Jersey

residents. In Tristar Prods. v. SAS Group, Inc., 2009 U.S. Dist. LEXIS 94592 *7-8 (D.N.J. Sept. 9, 2009), (exhibit "A") this Court explained that "[a]lthough the operation of a passive informational website does not by itself confer jurisdiction, it is well established that a fully interactive website that is used to conduct regular business deals with customers in a forum state does give rise to jurisdiction over claims that arise from those deals." Id. (citing Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452-54 (3d Cir. 2003); (Gourmet Video, Inc. v. Alpha Blue Archives, Inc., 2008 U.S. Dist. LEXIS 87645, 2008 WL 4755350, at *9-10 (D.N.J. Oct. 29, 2008); (Dluhos v. Strasberg, 2005 U.S. Dist. LEXIS 34385, 2005 WL 1683732, at *6 (D.N.J. Jun. 23, 2005)). "When determining whether a website should subject its operator to the jurisdiction of courts in a particular state, the Court must consider whether the defendant 'directly target[ed] its web site to the state, knowingly interact[ed] with residents of the forum state via its web site, or [has] sufficient other related contacts.'" Id. (citing Toys "R" Us, Inc., 318 F.3d at 454). If any of these criteria are met, then the purposeful direction prong of specific jurisdiction is satisfied. Id.

In Tristar the Court held that defendant, SAS, purposely directed its activities to New Jersey because its website included an online order form that could be transmitted directly over the internet. Id. The online order form contained a drop down menu where customers selected their state from a list which included New Jersey. For those reasons, this Court held "it is clear that SAS intends this site as a forum for business that is operated in part for the use of New Jersey customers." Id. Moreover, the Third Circuit has suggested that a plaintiff's knowledge of specific deals conducted over a website operated by a defendant is not necessary for a finding of personal jurisdiction. Id. at *9 (See Toys "R" Us, Inc., 318 F.3d at 454). "It is enough that a highly interactive commercial website is 'designed or intended" to reach customers in a

9

particular state.'" Id. Similarly, in this case, the Cartoon Network website has a shop with a link to a webpage dedicated specifically to "The Regular Show." See exhibit "B" attached hereto. (http://www.cartoonnetworkshop.com/category/code/reg_cnshop.do). On this website, New Jersey consumers can purchase a wide array of merchandise, including but not limited to DVDs of the previously televised seasons, comic books, apparel, watches, figurines, blankets, games, drinkware, etc. Id. Upon selecting an item to purchase, the consumer is directed to a checkout screen on which they must enter their shipping address. See exhibit "C" attached hereto. (https://www.cartoonnetworkshop.com/checkout/shippingfirstcheckout.do?method=view)

As in Tristar, the checkout page also contains a drop down menu of States, which includes the State of New Jersey. Id. Accordingly, by both broadcasting their television show and offering merchandise for sale to New Jersey residents on their website, Defendants have purposely directed their activities to this forum as required to satisfy the first prong of the specific jurisdiction test. See O'Connor., 496 F.3d at 317.

In order to satisfy the second prong of the specific jurisdiction analysis, the "plaintiffs' claims must also 'arise out of or relate to' at least one of those contacts." O'Connor, 496 F.3d at 318 (quoting Helicopteros, 466 U.S. at 414). "Unfortunately, the Supreme Court has not yet explained the scope of this requirement." Id. (See Helicopteros, 466 U.S. at 415 n. 10). While the Third Circuit has never adopted a definitive approach to the relatedness requirement, it has held that each case should be analyzed individually. Id. at 320. "[A]lthough the analysis may begin with but-for causation, it cannot end there. The animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." Id. at 321 (citing Burger King, 471 U.S. at 475-76). "Out-of-state residents who 'exercise the privilege of conducting activities within a state . . . enjoy the benefits and

protection of the state's laws; in exchange, they must submit to jurisdiction over claims that arise from or relate to those activities.'" Id. at 322 (citing Int'l Shoe, 326 U.S. at 319);( Burger King, 471 U.S. at 475-76). In the present case, the second prong of the test is satisfied because Plaintiff's claims are directly related Defendants' contacts with the State of New Jersey through both the broadcasting of "The Regular Show" and through sale of its merchandise to New Jersey residents.

Finally, the third prong of the specific jurisdiction analysis provides the Court "with an opportunity to consider any other factors that might make an exercise of jurisdiction substantially unfair to the defendant." Tristar Prods., 2009 U.S. Dist. LEXIS 94592 at *10. "When, however, a plaintiff has shown that a non-resident defendant has purposefully directed its activities to the forum, a heavy burden is on the defendant to present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Id. (citing Burger King, 471 U.S. at 477). "The Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies.'" O'Connor, 496 F.3d at 324 (citing Burger King, 471 U.S. at 477).

## B. VENUE IS PROPER UNDER 28 U.S.C. 1391(b)(2) BECAUSE A SUBSTANTIAL PART OF THE EVENTS GIVING RISE TO THIS CLAIM OCCURRED IN THE STATE OF NEW JERSEY

"Events or omissions that might only have some tangential connection with the dispute in litigation are not enough. Substantiality is intended to preserve the element of fairness so that a

defendant is not haled into a remote district having no real relationship to the dispute." Al-Ghena Int'l Corp., 957 F. Supp. 2d at 522 (citing Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994)). "[T]here can be more than one district where 'a substantial part of the events may occur.' The test still requires, however, that the New Jersey events or omissions have been 'substantial.'" Id. at 521. "[T]he Third Circuit instructed that when 'assessing whether events or omissions giving rise to the claims are substantial, it is necessary to look at the nature of the dispute.'" Id. (citing Cottman Transmission Sys., 36 F.3d at 295).

## II. VENUE SHOULD NOT BE TRANSFERRED PURSUANT TO 28 U.S.C. § 1404(a)

Defendants argue that in the event this Court is a proper venue for the above-captioned action, it should still be transferred to the United States District Court for the Central District of California, pursuant to 28 U.S.C. § 1404(a). 28 U.S.C. § 1404(a) states: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

"[I]n ruling on defendants' motion the plaintiff's choice of venue should not be lightly disturbed." Jumara v. State Farm Ins. Co., 55 F.3d at 879 (citing 1A PT.2 MOORE'S P 0.345[5] at 4360; 15 Charles A. Wright et al.);(Federal Practice and Procedure: Jurisdiction and Related Matters § 3848, at 385 (2d ed. 1986); (Schexnider v. McDermott Int'l, Inc., 817 F.2d 1159 (5th Cir. 1987); (Miracle Stretch Underwear Corp. v. Alba Hosiery Mills, Inc., 136 F. Supp. 508 (D. Del. 1955)). The burden of establishing the need for transfer rests with the movant. Jumara., 55 F.3d at 879 (citing 1A PT.2 MOORE'S P 0.345[5]);(Shutte v. Armco Steel Corp., 431 F.2d 22 (3d Cir. 1970), cert. denied, 401 U.S. 910 (1971)). "The burden is not on the plaintiff to show the

proposed alternative forum is inadequate. Rather, the burden is on the moving party to show the proposed alternative forum is not only adequate, but also more convenient than the present forum." Rappoport v. Steven Spielberg, Inc., 16 F. Supp. 2d 481, 499 (D.N.J. 1998)(*citing* Jumara, 55 F.3d at 879);(Lacey v. Cessna Aircraft Co., 862 F.2d 38, 43-44 (3d Cir. Pa. 1988); Ricoh Co. v. Honeywell, Inc., 817 F. Supp. 473, 480-481 (D.N.J. 1993)).

"The terms of [28 U.S.C. § 1404(a)] suggest three factors must be considered in transferring a case: (1) the convenience of the parties, (2) the convenience of the witnesses and (3) the interests of justice." Ricoh Co., 817 F. Supp. at 479 (*citing* Sandvik, Inc. v. Continental Ins. Co., 724 F. Supp. 303, 306 (D.N.J. 1989); (Derry Finance N.V. v. Christiana Cos., 555 F. Supp. 1043, 1045 (D. Del. 1983)). However, "courts have not limited their consideration to the three enumerated factors in § 1404(a)…and, indeed, commentators have called on the courts to 'consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'" Jumara, 55 F.3d at 879. "The analysis under section 1404 is flexible and must be made on the unique facts of each case." Ricoh Co., 817 F. Supp. at 479 (*citing* Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988); (Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249-50 (1981), reh'g denied, 455 U.S. 928 (1982)). "While there is no definitive formula or list of the factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a)." Jumara, 55 F.3d at 879.

### A. PRIVATE FACTORS

As set forth in Jumara, the private factors to be considered by this Court in deciding Defendants' Motion to Transfer include: 1) Plaintiff's forum preference as manifested in the original choice; 2) the defendant's preference; 3) whether the claim arose elsewhere; 4) the

convenience of the parties as indicated by their relative physical and financial condition; 5) the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; 6) and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). Jumara, 55 F.3d at 879 (*citing* 1A PT.2 MOORE'S P 0.345[5], at 4363);( 15 WRIGHT ET AL. § 3848).

Factor 1: "In the Third Circuit, a plaintiff's choice of forum is a "paramount concern" in deciding a motion to transfer venue." Wm. H. McGee & Co. v. United Arab Shipping Co., 6 F. Supp. 2d 283, 289 (D.N.J. 1997) "Unless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed." Id. at 289 (*citing* Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947); (Ricoh Co., 817 F. Supp. at 480). "A plaintiff's choice of forum is considered to be presumptively correct." Id. at 290 (*citing* Lacey, 862 F.2d at 45); (Hudson United Bank v. Chase Manhattan Bank, NA, 832 F. Supp. 881, 888 (D.N.J. 1993)).

Factor 4: Due to the fact that Defendants are corporate entities and Plaintiff is an individual with more limited resources, the Court must consider the financial disparity of the parties in determining whether transfer is appropriate. *See* Shore Slurry Seal v. CMI Corp., 964 F. Supp. 152, 157 (D.N.J. 1997). If Plaintiff and Defendants were both corporate entities, presumably with equivalent resources, Defendants would have a stronger argument for transfer. However, as an individual who spends a considerable amount of time in New Jersey for business purposes, it is far more cost efficient for the matter to remain venued in the District of New Jersey. For that reason, Plaintiff has shown that this factor weighs against transfer.

Factors 5 & 6: The Court must also consider the convenience of the witnesses and the evidence of both parties to the available districts. Wm. H. McGee & Co., 6 F. Supp. 2d at 290. In order "[t]o examine 'the relative ease of access to sources of proof' and the availability of

witnesses, the district court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of the evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defended to the action." Id. at 290-291 (citing Van Cauwenberghe v. Biard, 486 U.S. 517, 528 (1988)).

## B. PUBLIC FACTORS

As set forth in Jumara, the public factors include:  1) the enforceability of the judgment; 2) practical considerations that could make the trial easy, expeditious, or inexpensive; 3) the relative administrative difficulty in the two fora resulting from court congestion; 4); the local interest in deciding local controversies at home; 5) the public policies of the fora; and 6) the familiarity of the trial judge with the applicable state law in diversity cases. Jumara, 55 F.3d at 879-880 (citing 1A PT.2 MOORE'S P 0.345[5]);(15 WRIGHT ET AL. § 3854).

"Evaluation of the public interest factors include consideration of 'the locus of the alleged culpable conduct … and the connection of the conduct to plaintiff's chosen forum.'" Wm. H. McGee & Co., 6 F. Supp. 2d at 291-292 (citing Lacey, 862 F.2d at 48).

Clearly, as is certified and affirmed by Plaintiff, Billy Mitchell in his declaration, Defendants have a very real and substantial contact with the State of New Jersey, which should justified jurisdiction being placed in this State.  Further, Defendants have failed to meet their substantial burden of convincing this Court that California is the proper venue for this case. None of the Defendants have their offices, or their registered agent, in California.  The only persons that would be convenienced by a transfer of this matter to the State of California are the artists themselves, who happen to have a studio there.  All of the remaining parties would be

forced to litigate a matter 3000 miles from their residences and places of business. In addition, Mr. Mitchell certified that substantial contacts exist in the gaming community in the State of New Jersey, and Mr. Mitchell himself makes numerous appearances and the like, in New Jersey as well. Given the Regular Show's internet marketing, which includes New Jersey, and the show's popularity in the State of New Jersey, New Jersey is a proper forum for this case, and certainly a more appropriate venue than California.

## III.    DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED AS PLAINTIFF STATES A VALID CLAIM AS A MATTER OF LAW.

It is undisputed that the seminal case from the United States Court of Appeals, 3rd Circuit, relative to this matter is Hart v. Electronic Arts, Inc., 717 F.3d 141 (3rd Cir., 2013). However, the Hart case itself is not dispositive on this issue.

Although the Defendants' motion is a motion to dismiss, in that no discovery has yet occurred in this case, nor has an answer been filed, the summary judgment standard would nevertheless require that this motion be denied.

> "Summary judgment is appropriate "where the pleadings, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law." *Azur*, 601 F.3d at 216 (quoting *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 200) (en banc) (citing Fed.R.Civ.P. 56(c)). To be material, a fact must have the potential to alter the outcome of the case. See *Kaucher v. Cnty. of Bucks*, 455 F3d 418, 423 (3d Cir. 2006). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur*, 601 F.3d at 216. In determining whether summary judgment is warranted "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,106 S.Ct. 2505, 91 L.Ed.2d 2002 (1986); see also *Chambers ex rel. Chambers*, 587 F.3d at 181. "Further, [w]e may affirm the District Court on any grounds supported by the record." *Kossler v. Crisanti*, 564 F3d 181, 186 (3d Cir.

2009) (en banc) (internal quotation marks omitted)." <u>Hart</u>, <u>supra</u> at 148 - 149.

Further, as discussed in <u>Hart</u>, <u>supra</u>, at 149, the balance which the Courts must find in these cases is the first step in the analysis.

> "Courts have taken varying approaches in attempting to strike a balance between the competing interest in right of publicity cases, some more appealing than others.  In our discussions below, we first consider the nature of the interests we must balance and then analyze the different approaches courts have taken to resolving the tension between the First Amendment and the right of publicity." <u>Hart</u>, <u>supra</u>, at 149.

The Court's attention is directed to the analysis performed by the New Jersey Courts, and cited in <u>Hart</u>, <u>supra</u>, in the case of <u>Canessa v. J. I. Kislak, Inc.</u>, 97 <u>N.J. Super</u> 327, 235 A.2d 62 (N.J. Super. L., 1967), in which the New Jersey Court cited <u>Prosser, Law of Torts</u> (3ʳᵈ Ed., 1964), the analysis of these right of privacy cases.

> "Leading authorities have pointed out the need for a method of classification of the various aspects which come under the umbrella of the 'right of privacy'– *e.g., Green, 'The Right of Privacy,'* 28 Ill.L.Rev. 237, 332 (1932).  Green would classify the types of harms as (1) physical harms, (2) harms of appropriation and (3) harms of defamation.  Prosser points out that the early cases consequent upon the Warren and Brandeis article were preoccupied with the question whether the right of privacy existed at all, and give little or no consideration to what it would amount to if it did.  After a review of several hundred cases he concludes (with the reservation that 'what has emerged is no very simple matter') that some conclusions are possible, but that 'It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interest of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of plaintiff 'to be let alone'." (Op.cit., at p. 832).

> The four classifications which he propounds are (1) intrusion (e.g., intrusion upon plaintiff's physical solitude or seclusion, as by invading his home, illegal search, eavesdropping, prying into personal affairs, etc.); (2) public disclosure of private facts (e.g., making public private information about plaintiff); (3) placing plaintiff in a false light in the public eye (which need not be defamatory, but must be something that would be objectionable to the ordinary reasonable man), and (4) appropriation,

which he defines as an 'appropriation, for the defendant's benefit, of the plaintiff's name or likeness.'

For purposes here, we shall accent Prosser's four classifications.

It is only with respect to the last classification, namely appropriation for Defendants' benefit, more particularly for his commercial benefit, with which we are here concerned. We thus ask ourselves whether this type of invasion of privacy is an 'injury to the person' governed by the two-year statute of limitations. As to this classification (4) i.e., 'appropriation', Prosser says:

'Although the element of protection of the plaintiff's personal feelings is obviously not to be ignored in such a case, the effect of the appropriation decisions is to recognize or create an exclusive right in the individual Plaintiff to a species of trade name, his own, and a kind of trade mark in his likeness. It seems quite pointless to dispute over whether such a right is to be classified as 'property'; it is at least clearly proprietary in nature. Once protected by the law, it is a right of value upon which the plaintiff can capitalize by selling licenses.' (Op. Cit., at p. 842). Canessa, supra, at page 334 - 335.

Further, the New Jersey Court in Canessa, supra, made an observation at page 351 that is quite germane to this case:

"In any event, it seems to us that however little or much plaintiff's likeness and name may be worth, defendant, who has appropriated them for his commercial benefit, should be made to pay for what he has taken, whatever it may be worth.

In essence, defendant's contentions, if sustained, would carry into New Jersey the confusion which has been compounded by the fact that plaintiffs in other jurisdictions have based their actions in so--called 'right of privacy' cases solely upon 'injury to feelings,' without recognizing the basic property rights involved, as they were recognized before and after the *Warren-Brandeis* [235A2d 76] historic article. Defendant, as do many of the decisions, fails to appreciate the distinctions among the four classifications of right of privacy put forth by Prosser, or among the three classifications suggested by Dean Leon Green in his article, '*The Right of Privacy*.' 27 Ill.L.Rev.237." Canessa, supra, at 351.

The Third Circuit Court of Appeals in Hart, supra, at pages 150 - 151, recognized New Jersey's long held belief that Plaintiffs names and likenesses belonged to them, and that they are "things of value".

> "However, this early conceptualization had limitations, particularly when it comes to protecting the property interests of celebrities and people already in the public eye. *See id.* ("It is certain that a man in public life may not claim the same immunity from publicity that a private citizen may."); see also *McCarthy*, supra, at §1.25. Faced with this limitation on the legal doctrine, courts began to recognize a "right of publicity," which protected publicly known persons from the misappropriation of their identities. The first case to describe the protection as a "right of publicity" was *Haelan Labs., Inc. V. Topps Chewing Gum, Inc.*, 2002 F3d 866 (2d Cir. 1953) (concerning baseball cards in gum packages). There, the Second Circuit held that "in addition to and independent of that right of privacy . . . , a man has a right in the publicity value of his photograph . . . This right might be called a 'right of publicity.' *Id.* At 868. New Jersey courts, which had long recognized a "right of privacy [and] a right of property," were not far behind in voicing their support for this concept. *Ettore v. Philco Television Broad. Corp.*, 229 F2d 481, 491 (3d Cir. 1956). In the seminal case of *Palmer v. Schonhorn Enters., Inc.*, the Superior Court of New Jersey noted that [p]erhaps the basic and underlying theory is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized. 96 N.J. Super. 72, 232 A.2d 458, 462 (Ch. Div. 1967) (citations omitted) (finding an infringement of property rights where a golfer's name was used in connection with a golf game); see also *Canessa v. J.I. Kislak, Inc.*, 97 N.J. Super. 327, 235 A.3d 62, 76 (Law Div. 1967) ("[T]he reality of a case such as we have here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value."). Hart, supra, at 150 - 151.

And further,

> New Jersey law therefore recognizes that "[t]he right to exploit the value of [an individual's] notoriety or fame belongs to the individual with whom it is associated," for an individual's "name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation." *McFarland v. Miller*, 14 F.3d 912, 919, 923 (3d Cir. 1994). As such, the goal of maintaining a right of publicity is to protect the property interest that an individual gains and enjoys in his identity through his labor and

19

effort.  Additionally, as with protections for intellectual property, the right of publicity is designed to encourage further development of this property interest.  *Accord Zacchini*, 433 U.S. at 573, 97 S. Ct. 2849 ("[T]he State's interest in permitting a 'right of publicity' . . . is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors . . . ").  Hart, supra, at 151.

In the case before this Court, there is a very clear question from the outset as to whether the Defendants' actions satisfy the "Transformative Use Test".  Defendants readily admit that the character known as GBF is in fact the Plaintiff, Billy Mitchell.  Plaintiff asserts that the Defendants have not created a transformative figure that can be recognizably their own.

The Declaration of Billy Mitchell, and the Plaintiff's complaint, now certified by Mr. Mitchell, dispute the transformative nature of GBF.  At this stage of the litigation, this Court should permit this matter to move forward, with discovery and depositions, to allow the Plaintiff to explore what efforts, if any, were made by the Defendants and the creators of the Regular Show to transform Mr. Mitchell's direct likeness.  A motion to dismiss at this early stage of litigation is entirely premature, and should not be granted.

In Hart, supra, at page 158, the Court discussed the rejection of the Rogers Test in cases such as Ryan Hart's dispute with Electronic Arts, Inc.  In rejecting the Rogers Test, the Court in Hart stated as follows:

> "On the other hand, we do agree with the *Rogers* court in so far as it noted that the right of publicity does not implicate the potential for consumer confusion and is therefore potentially broader than the protections offered by the Lanham Act. *Rogers*, 875 F.2d at 1004.  Indeed, therein lies the weakness of comparing the right of publicity to trademark protections: the right of publicity is broader and, by extension, protects a greater swath of property interests.  Thus, it would be unwise for us to adopt a test that hews so closely to traditional trademark principles.  Instead, we need a broader, more nuanced test, which helps balance the interests at issue in cases such as the one at bar.  The final test - the Transformative Use Test - provides just such an approach." Hart, supra, at 158.

The <u>Hart</u> decision went on to discuss the Transformative Use Test, which was first articulated by the Supreme Court of California.

"c.  The Transformative Use Test.  Looking to intellectual property law for guidance on how to balance property interests against the First Amendment has merit.   We need only shift our gaze away from trademark, to the broader vista of copyright law.  Thus, we come to the case of *Comedy III Prods., Inc. V. Gary Saderup, Inc.*, which imported the concept of "transformative" use from copyright law into the right of publicity context.  25 Cal. 4[th] 387, 106 Cal. Rptr. 2d 126, 21 P.3d 797, 804-08 (2001).  This concept lies at the core of a test that both Appellant and Appellee agree is applicable to this case: the Transformative Use Test.

I. Genesis of the Transformative Use Test.  The Transformative Use Test was first articulated by the Supreme Court of California in *Comedy III*. That case concerned an artist's production and sale of t-shirts and prints bearing a charcoal drawing of the Three Stooges.  The California court determined that while "[t]he right of publicity is often invoked in the context of commercial speech," it could also apply in instances where the speech is merely expressive.  *Id.*, 106 Cal. Rptr. 2d 126, 21 P.3d at 802-803.  The court also noted, however, that when addressing expressive speech, "the very importance of celebrities in society means that the right of publicity has the potential of censoring significant expression by suppressing alternative versions of celebrity images that are iconoclastic, irreverent or otherwise attempt to redefine the celebrity's meaning.  *Id.*, 106 Cal. Rptr. 2d 126, 21 P.3d at 803.  Thus, while the "the right of the publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals," *Id.*, 106 Cal. Rptr. 2d 126, 21 P.3d at 807, the right, like copyright, nonetheless offers protection to a form of intellectual property that society deems to have social utility, *Id.*, 106 Cal. Rptr. 2d 126, 21 P.3d at 804.

After briefly considering whether to import the "fair use" analysis from copyright, the *Comedy III* court decided that only the first fair use factor, "the purpose and character of the use" was appropriate. *Id.*, 106 Cal. Rptr. 2d 126, 21 P.3d at 808.  Specifically, the *Comedy III* court found persuasive the Supreme Court's holding in *Campbell v. Acuff-Rose Music, Inc.*, that the central purpose of the inquiry into this fair use factor 'is to see . . . whether the new work merely "supercede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; it asks, in other words, whether and to what extent the new work is "*transformative*". *Id.* (Emphasis added) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S. Ct. 1164, 127 L.Ed.2d 500 (1994))." <u>Hart</u>, <u>supra</u>, at 158 - 159.

In the case before this Court, the analysis is simple.

> "[w]hether the celebrity likeness is one of the "raw materials" from which the original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, *whether the product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness.* And when we use the word "expression," we mean expression of something other than the likeness of the celebrity." *Id*. (emphasis added) Hart, supra at 160.

It is respectfully submitted that at this junction of the case, Billy Mitchell's claims against the various Defendants asserts facts which lie somewhere between the Comedy III case and Winter cases cited in Hart, supra.

> "Arguably, the *Comedy III* and *Winter* decisions bookend the spectrum of cases applying the Transformative Use Test. Where *Comedy III* presents a clear example of a non-transformative use (i.e., mere literal depictions of celebrities recreated in a different medium), Winter offers a use that is highly transformative (i.e., fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities)." Hart, supra at 161.

Further, it is submitted that this case involving Billy Mitchell and these particular Defendants is more akin to the case of No Doubt v. Activision Publishing, Inc., 192 Cal. App. 4th 1018, 122 Cal. Rptr. 3d 397 (2011), which is cited in Hart, supra, at page 162.

The No Doubt case's facts are more akin to the case before this Court than those in Hart. The No Doubt case involved the following analysis, as cited in Hart:

> "The *No Doubt* court began by noting that "in stark contrast to the 'fanciful creative characters' in *Winter and Kirby*." the No Doubt avatars could not be altered by players and thus remained "at all times immutable images of the real celebrity musicians." *Id*. At 410. But this fact, by itself, did not end the court's inquiry since "even literal reproductions of celebrities can be 'transformed' into expressive works based on the context into which the celebrity image is placed." *Id*. (Citing *Comedy III*, 106 Cal. Rptr. 2d 126, 21 P.3d at 811). Looking to the context of the Band Hero game, the court found that "no matter what else occurs in the game *during the depiction of the No Doubt avatars,* the avatars perform rocks songs, the same activity by which the band achieved and maintains its fame." *Id*. At 401- 11 (emphasis added). The court explained:

[T]he avatars perform [rock] songs as literal recreations of band members. That the avatars can be manipulated to perform at fanciful venues including outer space or to sing songs the real band would object to singing, or that the avatars appear in the context of a videogame *that contains many other creative elements,* does not transform the avatars into anything other than the exact depictions of No Doubt's members doing exactly what they do as celebrities. *Id.* At 411 (emphasis added). As a final step in its analysis, the court noted that Activision's use of highly realistic digital depictions of No Doubt was motivated by a desire to capitalize on the band's fan-base, "because it encourages [fans] to purchase the game so *to perform as, or alongside, the members of No Doubt." Id.* (emphasis added). Given all this, the court concluded that Activision's use of No Doubt's likenesses did infringe on the band's rights of publicity." *Id.* at 411 - 12. Hart, supra, 162 - 163.

Following its analysis of the No Doubt case referenced about, the Third Circuit Court of

Appeals went on to make the following determination, which is most enlightening to this Court.

"On the other hand, unlike the Predominant Use Test, applying the Transformative Use Test requires a more circumscribed inquiry, focusing on the specific aspects of a work that speak to whether it was merely created to exploit a celebrity's likeness. This test therefore recognizes that if First Amendment protections are to mean anything in right of publicity claims, courts must *begin* by considering the extent to which a work is the creator's own expression." Hart, supra, at page 163.

Clearly, it is entirely premature for this Court to consider Defendants' motion to dismiss,

when discovery is needed in order for the Court to perform this "more circumscribed inquiry".

Plaintiff is entitled to discovery on these issues so that the Court can make a determination as to

"the extent to which a work is the creator's own expression". The Hart court, in applying the

Transformative Use Test at page 166, did the following analysis:

"Having thus cabined our inquiry to the appropriate form of Appellant's identity, we note that - based on the combination of both the digital avatar's appearance and the biographical and identifying information - the digital avatar does closely resemble the genuine article. Not only does the digital avatar match Appellant in terms of hair color, hair style and skin tone, but the avatar's accessories mimic those worn by the Appellant during his time as a Rutgers player. The information, as has already been noted, also accurately tracks Appellant's vital and biographical details. And while the inexorable march of technological progress may make

23

some of the graphics in earlier editions of NCAA Football look dated or overly-computerized, we do not believe that video game graphics must reach (let alone cross) the uncanny valley to support a right of publicity claim.  If we are to find some transformative element, we must look somewhere other than just the in-game digital recreation of Appellant.  Cases such as *ETW* and *No Doubt*, both of which address realistic digital depictions of celebrities point to the next step in our analysis: context." Hart, supra at page 166.

Based upon the Declaration of Billy Mitchell annexed, and the google search, a strong argument can be made that the GBF character closely resembles the genuine article known as Billy Mitchell.  As such, there is a lack of transformative context in this particular case.  As further indicated in Hart, supra, at page 169: "**Decisions applying the Transformative Use Test invariably look to how the *celebrity's identity* is used in or is altered by other aspects of a work.**" (emphasis added).

Two footnotes appear on the Hart decision, supra, which are relevant to this Court's inquiry.  Footnote 23 certainly gives an indication as to why the Defendants are attempting to move venue in this matter to California.

"23. Unlike in New Jersey, California's right of publicity is a matter of both the state's statutory law and its common law.  *Laws v. Sony Music Entm't. Inc.*, 448 F.3d 1134, 1138 (9th Cir. 206) (discussing both the statutory and the common law cause of action); see also Cal. Civ. Code §334; *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 198 Cal. Rptr. 342, 347 (1983).  This difference notwithstanding, the laws are strikingly similar - and protect similar interests.  Under California law, "any person who knowingly uses another's name . . . or likeness, in any manner, or in any products, merchandise, or goods, or for the purposes of advertising or selling, or soliciting purchase of . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."  Cal. Civ. Code §3344(a).  In the words of the California Supreme Court "the right of publicity is essentially an economic right.  What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame . . . " *Comedy III*, 106 Cal. Rptr. 3d 126, 21 P.3d at 807.  This is analogous to the conceptualization of the right of publicity in New Jersey, and we consequently see no issue in applying balancing tests developed in California to New Jersey."  Hart, supra, footnote 23.

24

Further, footnote 39 is particularly relative to the case at bar.

> "39. It is no answer to say that digitizing Appellant's appearance in and of itself works a transformative use.  Recreating a celebrity's likeness or identity in some other medium other than photographs or video cannot, without more, satisfy the test; this would turn the inquiry on its head - and would contradict the very basis for the Transformative Use Test. *See, e.g. Comedy III*, 106 Cal. Rptr. 2d 126, 21 P.3d at 809 (applying the Transformative Use Test to charcoal drawings of the Three Stooges); see also *Estate of Presley v. Russen*, 513 F. Supp. 1339, 1359 (D.N.J. 1981) ("[E]ntertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment.")." <u>Hart</u>, <u>supra</u>, footnote 32.

Simply stated, Defendants have failed to demonstrate on this motion to dismiss why Plaintiff's valid claims should be dismissed by the Court without the benefit of discovery.

Accordingly, it is respectfully submitted that the Defendant's motion to dismiss be denied.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Defendants' motion be denied.

Dated:        October 27, 2015

                                        By:   S/ Robert A. Ballard, Jr.
                                            ROBERT A. BALLARD, JR. RB 7580
                                            Attorney ID# 020911984
                                            Ballard & Dragan
                                            Attorneys for Plaintiff



**TRISTAR PRODUCTS, INC., Plaintiff, v. SAS GROUP, INC., Defendant.**

**Civil Action No. 08-6263 (PGS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2009 U.S. Dist. LEXIS 94592*

**September 9, 2009, Decided**
**October 9, 2009, Filed**

**NOTICE:**    NOT FOR PUBLICATION

**COUNSEL:** [*1] For TRISTAR PRODUCTS INC., Plaintiff: SHAFFIN ABDUL DATOO, LEAD ATTORNEY, VENABLE LLP, NEW YORK, NY.

For SAS GROUP, INC., Defendant: JON ANTHONY CHIODO, LEAD ATTORNEY, HOFFMANN & BARON, PARSIPPANY, NJ.

**JUDGES:** PETER G. SHERIDAN, United States District Judge.

**OPINION BY:** PETER G. SHERIDAN

**OPINION**

**SHERIDAN, U.S.D.J.**

Defendant, SAS Group, Inc. ("SAS"), moves to dismiss the Complaint of Plaintiff Tristar Products, Inc. ("Tristar") for lack of personal jurisdiction and failure to state a claim upon which relief may be granted. For the reasons that follow, the motions will be denied.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Plaintiff, Tristar, is a Pennsylvania corporation in the business of developing and selling household products. Tristar's principal place of business is located in Fairfield, New Jersey. In October of 2007, Pitchwell Group Ltd. ("Pitchwell") created a television advertisement entitled "Titan Vegetable Shaver" which was first broadcast on or about November 10, 2007. At some point after the advertisement's creation, Pitchwell assigned its right to the copyright in the work to Tristar, and on December 17, 2008 Tristar applied to the Register of Copyrights for a Certificate of Registration. In June 2008, [*2] Tristar created a derivative work entitled "Titan Peeler," first broadcast on or about July 26, 2008, and on December 18, 2008 applied to the Register of Copyrights for a Certificate of Registration for that work. Tristar has since used both of these works to market its product, the Titan Peeler.

Sometime after the production of the two Titan Peeler advertisements, Defendant SAS created a television advertisement for a similar

Exhibit A

2009 U.S. Dist. LEXIS 94592, *

product, the Homesmart Samurai Speed Peeler ("Samurai"), which it began broadcasting in August 2008. SAS is incorporated in the state of New York and its principal place of business is in Tarrytown, New York. The Samurai advertisement is distributed in part by national cable channels that air in New Jersey and through a website which can be accessed in New Jersey. [1] The Samurai is also sold by a retailer called As Seen On TV Guys. The retailer sells the Samurai on its website and in their stores, at least one of which is in New Jersey.

> 1     The website's URL is www.samuraipeeler.com. When accessed, the website plays the Samurai advertisement on a continuous loop and provides visitors with an online order form for purchasing the Samurai.

Tristar claims that SAS's Samurai [*3] advertisement is "substantially identical" to its own advertisements for the Titan Peeler and alleges that SAS used its works without permission to create a derivative advertisement. On December 22, 2008, Tristar filed a Complaint with this Court alleging that SAS committed copyright infringement. Tristar seeks to have this Court enjoin SAS from further infringing on its copyright and to award actual damages it received from SAS's actions. [2] SAS moved to dismiss the complaint on February 9, 2009.

> 2     The complaint originally requested damages in the amount of $ 150,000 per infringement and attorney's fees pursuant to the Copyright Act of 1976, *17 U.S.C. §§ 101*, *504(c) et seq.*, but Tristar withdrew this request in its Memorandum in Opposition to Motion to Dismiss Complaint.

**DISCUSSION**

SAS argues that Tristar's complaint should be dismissed because of a lack of personal ju-

risdiction under *Rule 12(b)(2)*, and a failure to state a claim upon which relief may be granted under *Rule 12(b)(6)*. SAS alternatively requests that a more definite statement under *Rule 12(e)* must be pleaded. Each argument will be addressed in turn.

**I. Motion to Dismiss for Lack of Personal Jurisdiction.**

SAS argues that this [*4] Court lacks personal jurisdiction over it because Tristar has failed to demonstrate that SAS has continuous or systematic contacts with New Jersey, or that it has purposefully directed any activities at New Jersey. For the reasons that follow, this argument fails.

**A. Standard of Review**

Pursuant to *Fed. R. Civ. P. 12(b)(2)*, a complaint may be dismissed for lack of personal jurisdiction. "If an issue is raised as to whether a court lacks personal jurisdiction over a defendant, the plaintiff bears the burden of showing that personal jurisdiction exists." *Marten v. Godwin, 499 F.3d 290, 295-96 (3d Cir. 2007)*. "To meet this burden, the plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contacts with the forum state ('general jurisdiction')." *Provident Nat'l Bank v. CA Fed. Sav. & Loan Assn., 819 F.2d 434, 437 (3d Cir. 1987)* (citations omitted). Under *Fed. R. Civ. P. 4(k)*, "'a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of [*5] that state.'" *Id. at 296* (quoting *Provident Nat'l Bank, 819 F.2d at 437*; *Fed. R. Civ. P. 4(k)(1)(A)*). Pursuant to the New Jersey long-arm rule, N.J. Court R. 4:4-4(c), personal jurisdiction in New Jersey "extends to the limits of the *Fourteenth Amendment* Due Process protection." *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 145*

2009 U.S. Dist. LEXIS 94592, *

*(3d Cir. 1992)*. Therefore, this Court is "constrained, under New Jersey's long-arm rule, only by the 'traditional notions of fair play and substantial justice,' inhering in the *Due Process Clause of the Constitution*." *Id.* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*. Those notions require that a defendant have certain minimum contacts with the forum state based upon the defendant's own purposeful availment "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*. Unilateral activity on the part of the plaintiff will not cause the defendant to be subject to personal jurisdiction in that forum. *Id.*

However, physical entry into the forum state is not necessary to maintain personal jurisdiction over a defendant. *Id. at 476.* [*6] While a presence in the forum will only serve to enhance a defendant's affiliation therewith and serve to reinforce foreseeability of suit therein, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* All that is necessary for sufficient minimum contacts to be established in the forum state is for "a commercial actor's efforts [to be] 'purposefully directed' toward residents of another State." *Id.*

## B. SAS is subject to personal jurisdiction in this forum

Here, Tristar confines its argument to the question of specific jurisdiction. The three-pronged test for specific personal jurisdiction requires that: (1) the nonresident defendant must purposefully direct its activities at the forum; (2) the claim must be one which arises out of or relates to the defendant's fo-

rum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007)*; Here, Tristar has alleged sufficient facts [*7] to subject SAS to the personal jurisdiction of this Court..

Tristar argues that it can satisfy the first prong of the *O'Connor* test, which requires that SAS purposefully directed its activities at New Jersey, in three ways: 1) SAS furnished the Samurai advertisement to national cable television channels that transmit to televisions in New Jersey; 2) the Samurai Speed Peeler is sold by New Jersey retailer, As Seen on TV Guys, both on a website and in at least one retail store in New Jersey; 3) SAS has displayed the Samurai advertisement on its website which is accessible to New Jersey residents and which solicits orders for the Samurai Speed Peeler. Although the operation of a passive informational website does not by itself confer jurisdiction, it is well established that a fully interactive website that is used to conduct regular business deals with customers in a forum state does give rise to jurisdiction over claims that arise from those deals. *See Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452-54 (3d Cir. 2003)*; *Gourmet Video, Inc. v. Alpha Blue Archives, Inc., 2008 U.S. Dist. LEXIS 87645, 2008 WL 4755350, at *9-10 (D.N.J. Oct. 29, 2008)*; *Dluhos v. Strasberg, 2005 U.S. Dist. LEXIS 34385, 2005 WL 1683732, at *6 (D.N.J. Jun. 23, 2005)*. [*8] When determining whether a website should subject its operator to the jurisdiction of courts in a particular state, the Court must consider whether the defendant "directly target[ed] its web site to the state, knowingly interact[ed] with residents of the forum state via its web site, or [has] sufficient other related contacts." *Toys "R" Us, Inc., 318 F.3d at 454*. If any of these criteria are met, then the purposeful direction prong of specific jurisdiction is satisfied. *Id.*

2009 U.S. Dist. LEXIS 94592, *

Here, SAS purposely directed its activities to New Jersey since SAS's website includes an online order form that can be transmitted directly over the internet. The order form includes a drop down menu where customers select their state from a list which includes New Jersey. The website also includes several solicitations to use the order form, such as the phrase "ORDER NOW" in large font and a continuous loop of the Samurai advertisement. In sum, it is clear that SAS intends this site as a forum for business that is operated in part for the use of New Jersey customers.

SAS disputes same because the website cannot confer personal jurisdiction since Tristar has not claimed to have any personal knowledge of any transactions [*9] that have actually occurred between New Jersey residents and SAS via the website. Indeed, in the majority of cases in which a court has found that a website has conferred jurisdiction, part of the reasoning has been that a significant amount of business or communication has occurred between the defendant and residents of the forum state through the site. *See, e.g., Gourmet Video, 2008 U.S. Dist. LEXIS 87645, 2008 WL 4755350 at *15-16*; *Zippo Mfg. Co. v. Zippo DOT Com, 952 F. Supp. 1119, 1126 (W.D. Pa. 1997)*. The Third Circuit, however, has suggested that a plaintiff's knowledge of specific deals conducted over a website operated by a defendant is not necessary for a finding of personal jurisdiction. *See Toys "R" Us, Inc., 318 F.3d at 454*. It is enough that a highly interactive commercial website is "designed or intended" to reach customers in a particular state. *Id.* Here, SAS's website was designed to reach New Jersey customers, and there is contact with New Jersey through the retailer As Seen On TV Guys, the first prong of specific jurisdiction is met.

The second prong of the *O'Connor* test requires that Tristar establish that its claim arises out of or is related to SAS's contacts with New Jersey. As demonstrated [*10] above, SAS's contacts with New Jersey including its posting of the Samurai advertisement on an interactive commercial website and via television. Tristar's claim is that this very advertisement infringes on its copyrighted advertisement. Thus, the claim is directly related to the Defendant's contacts with the state.

Finally, Tristar also satisfies the third prong of the *O'Connor* test, which requires that an assertion of personal jurisdiction must comport with traditional notions of fair play and substantial justice. This provides the court with an opportunity to consider any other factors that might make an exercise of jurisdiction substantially unfair to the defendant. When, however, a plaintiff has shown that a non-resident defendant has purposefully directed its activities to the forum, a heavy burden is on the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King, 471 U.S. at 477*. Here, SAS has not brought any considerations of this type.

SAS's motion to dismiss the case for lack of personal jurisdiction is therefore denied.

## II. Motion to Dismiss for Failure to State a Claim

As a preliminary matter, [*11] it should be noted that in support of its motions, SAS has submitted a Declaration from the President of SAS, Scott Sobo ("Sobo Declaration"). The Sobo Declaration consists of ten numbered paragraphs, the first six of which pertain generally to the jurisdictional arguments raised by SAS, and the last four are facts which pertain generally to the SAS's claim that Tristar failed to state a claim. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042, 114 S. Ct. 687, 126 L. Ed. 2d 655 (1994)*. Under *Fed. R.*

Civ. P. 12(d), a court may convert a motion made pursuant to *Fed. R. Civ. P. 12(b)(6)* to a motion for summary judgment if extrinsic documents are appended thereto. However, this is unnecessary where the court is asked to "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *White Consol. Indus., 998 F.2d at 1196*. Here, the Sobo Declaration and attached exhibits-- namely, the commercials [*12] referenced in plaintiff's complaint-- form the basis for plaintiff's claims. As a result, this court will consider the Sobo Declaration and its attachments without converting defendant's motion to dismiss to a motion for summary judgment.

**A. Standard of Review**

On a motion to dismiss for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See, e.g., Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994)*. A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal, 129 S. Ct. at 1950*. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000)*, cert. denied, *Forbes v. Semerenko, 531 U.S. 1149, 121 S.Ct. 1091, 148 L. Ed. 2d 965 (2001)*. While [*13] a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal, 129 S. Ct. at 1949*; *Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir.1997)*. "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993)* (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). The Supreme Court has recently held that "[w]hile a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly, 550 U.S. at 555* [*14] (internal citations and quotations omitted); *see also Iqbal, 129 S. Ct. at 1949-50*.

**B. Dismissal of Tristar's Claim Pursuant to 12(b)(6) Is Denied**

To sufficiently allege a copyright infringement claim, a plaintiff must allege both that it has a valid copyright in the work and that the defendant copied elements of the work that are original. *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1231 (3d Cir. 1986)*.

It is a general principle of copyright law [3] that substantial similarity between two works cannot be demonstrated solely by pointing out random similarities across the works. See, e.g., *Williams v. Crichton, 84 F.3d 581, 589 (2d Cir. 1996)*; *Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1044 (9th Cir. 1994)*; *Pino v. Viacom, Inc., 2008 U.S. Dist. LEXIS 24453, 2008 WL 704386 (D.N.J. 2008 U.S. Dist. LEXIS 24453)*. This is especially true when the copyright infringement claim is based on an original arrangement of unprotected materials,

2009 U.S. Dist. LEXIS 94592, *

as the entire basis for the claim is that both works are identically sequenced. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349-51, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).*

    3    SAS argued Tristar has no standing to sue because it did not show ownership of the commercial. Tristar submitted Certificates [*15] of Registration which are sufficient to show ownership. *Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 290-91 (3d Cr. 1991).* Because ownership of the copyright has been established, Tristar has standing to sue.

Here, SAS argues that the Titan Peeler and Titan Vegetable Shaver advertisements are entirely composed of unoriginal material not protected by the Copyright Act. Specifically, SAS claims that all of the images and phrases used in the advertisements belong in one of three categories that fall outside of copyright protection: 1) they demonstrate the functional elements of all vegetable peelers; 2) they constitute *scenes a faire* which are indispensable to any promotion of a kitchen utensil; and 3) they

are examples of material and themes common to all infomercials. Because of this, SAS argues that the list of "significant similarities" between the two advertisements that Tristar provided in the Complaint is insufficient to support a claim for copyright infringement.

Tristar's response to this argument is to concede that while many of the specific images and phrases it lists in the Complaint are unoriginal if viewed in isolation, the exact sequence of ideas, images, [*16] and themes within the advertisement is original, and it is that which SAS copied. In P 14 of the Complaint, Tristar alleges that SAS used copies of the Titan Vegetable Shaver and Titan Peeler advertisements to create a "substantially identical" television commercial. In P 15, Tristar provides a side-by-side comparison of "significant similarities" between its advertisements and the Samurai advertisement. The list consists of excerpts from the text and two still images of each advertisement. While the list does not state outright that the two are "identically sequenced," a review of the commercials, does indicate nearly identical sequencing. In point of fact, the court's review of the commercials revealed following sequence of claims made:

| Titan Peeler | Order of Claim | Samurai Peeler | Order of Claim |
|---|---|---|---|
| The secret is Titan's dual-action | 1 | The Samurai Speed Peeler | 1 |
| blades that peel and slice on an | | is the amazing | |
| upward motion as well as | | dual-action peeler and | |
| downwards-- making it twice as | | slicer that works down one | |
| fast as ordinary peelers that | | way and up the other so | |
| only work in one direction. | | you do twice the work in | |
| | | half the time. | |
| Peel onions quickly and easily | 3 | Peeling onions so fast, | 3 |
| with no tears. | | you won't have time to | |
| | | cry. | |
| Glide over soft and hard cheese | 4 | Slice hard or soft cheese | 4 |
| and get a perfect slice every | | in a breeze. | |
| time. | | | |
| The Titan's twin micro blades | 5 | It's tough enough to cut | 6 |
| are tough enough to cut through | | through this two-by-four, | |
| wood, yet sharp enough to peel | | yet it will steel peel | |

2009 U.S. Dist. LEXIS 94592, *

| Titan Peeler | Order of Claim | Samurai Peeler | Order of Claim |
|---|---|---|---|
| the delicate skin of a tomato. | | the skin from this beautiful peach. | |
| Watch as it creates fabulous julienne slices fast and precise every time. Power through piles of cabbage to make tasty, homemade cole slaw in seconds. | 6 | Prepare a medley of vegetables, a pile of homemade shoestring potatoes and watch as it shreds a mountain of fresh cole slaw in just seconds. | 9 |
| The Titan Peeler is made from 100% stainless steel, so it will never break or dully. That's why we're offering a lifetime warranty on the blades. | 9 | Made with forever-sharp stainless steel blades | 5 |
| Slice through mounds of vegetables for stir frying in half the time. | 2 | Use it as a slicer to make healthy salads right in the bowl or a delicious stir fry right into the pan. | 8 |
| Slice through onions, cucumbers and carrots, making perfect slices every time. | 8 | Carrots, cucumbers, zucchini and potatoes. | 2 |
| We'll also include this amazing slicing board to turn your Titan Peeler into a super-fast mandolin slicer. | 7 | And here's the best part! Your Samurai Peeler turns into a mandolin slicer-- just snap in the platform and start speed slicing. | 7 |

The [*17] allegations as pled are sufficient to survive a motion to dismiss, where they must be taken as substantively true. *See Iqbal, 129 S. Ct. at 1950.* Defendant's motion to dismiss is denied.

### Conclusion

For the foregoing reasons, defendant's motions to dismiss for lack of personal jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)* and for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)* are denied.

*/s/ Peter G. Sheridan*

PETER G. SHERIDAN, U.S.D.J.

September 9, 2009



FREE SHIPPING ON ORDERS OVER $100*

Welcome Guest, Sign In | My Account | Track Order | Wishlist | 866-373-2107

What are you looking for?          0 Items | $0.00

**WHAT'S NEW**  **DVDS**  **GAMES**  **CLOTHING**  **PHONE CASES**  **COSTUMES**  **ACCESSORIES**  **HOME DECOR**  **ON SALE**



# REGULAR SHOW

**REGULAR SHOW**

Newest Items
Backpacks & Bags
Blankets, Bedding & Bath
Books
Boxers & Briefs
Collectible Figurines
DVDs
Footwear & Socks
Games
Jackets & Sweatshirts
Keychains & Belts
Mouse Pads & Tech
Accessories
Mugs & Drinkware
Phone Cases
Plush
Posters
Shirts
Stationery
Wall Decor
Watches



**Shirts**
Bestselling shirts!

**Comics**
Catch up on the latest comics!

**Flip Flops**
Walk the beach in style!

**Lunch Box**
Be the envy at the lunch table.

**New Fleece Blanket**
New blanket with Rigby & Mordecai

~~~~ **BEST SELLING PHONE CASES!** ~~~~

    

**SHIRTS**          **MUGS**          **DVDs**

            

**BEDDING**      **KEYCHAINS & BELTS**      **BOOKS**

            

Regular Show | CartoonNetworkShop.com





SIGN UP FOR OUR LATEST NEWS AND SPECIAL OFFERS:  Enter Email for our Newsletter        **SUBMIT**

**CUSTOMER SERVICE**
Track Order
How to Order
FAQ
Shipping & Delivery
Tax Information
Returns & Exchanges
Contact Us
(866) 373-2187

**SECURITY AND PRIVACY**
Privacy Policy
Terms & Conditions
Safe Shopping Guarantee

**ABOUT THE SHOP**
Affiliate Program
Volume Discounts
CartoonNetwork.com
**WE ACCEPT:**

 **VISA** 

CartoonNetworkShop.com is operated under a license from Cartoon Network by Bolder Road LLC
which is solely responsible for the site's content and all aspects of your purchase
© 2015 All Rights Reserved

™ & © 2015 Cartoon Network

Cartoon Network Shop

Page 1 of 2

FREE SHIPPING ON ORDERS OVER $100!*

**CN**shop

Welcome Guest, Sign In | My Account | Track Order | Wishlist | 866-373-2107

What are you looking for?

1 Item | $18.95

**WHAT'S NEW   DVDS   GAMES   CLOTHING   PHONE CASES   COSTUMES   ACCESSORIES   HOME DECOR   ON SALE**

## SECURE CHECKOUT

This page is safe and secure. See details

**SIGN IN**    Login

**SHIPPING ADDRESS AND SHIPPING METHOD**

**SHIPPING ADDRESS (Please note that we can't ship to PO boxes.)**

*FIRST NAME                     *LAST NAME

COMPANY NAME

*STREET ADDRESS

ADDRESS LINE 2

*CITY            *State:            *Zip Code:
                 NJ-New Jersey ∨

*COUNTRY
US-United States ∨

*PHONE NUMBER

☑ USE THIS ADDRESS FOR MY BILLING INFORMATION
Uncheck this box to use a different billing address.

**DELIVERY OPTIONS**

◉ Standard - Transit time 3 to 5 business days($4.99)

○ Two Day Air - Transit time 2 business days (not including weekends and holidays)($14.99)

○ Next Day Air - Transit time overnight (not including weekends and holidays)($19.99)

**GIFT OPTIONS**

Click here to enter a free gift message and/or to purchase gift boxing of individual items.

CONTINUE

**BILLING ADDRESS, PAYMENT, AND COUPONS**

**REVIEW AND PLACE ORDER**

**MY SHOPPING CART**                     Edit

Regular Show: Party Pack
(Vol. 3) DVD
Ships to U.S. only
Quantity: 1
Price.          $18.95 each

**SUMMARY OF CHARGES**

Subtotal:     $18.95
Shipping:     $4.99
Tax:          $0.00
**Order Total:   $23.94**

SIGN UP FOR OUR LATEST NEWS AND SPECIAL OFFERS:   Enter Email for our Newsletter      SUBMIT

Exhibit C

https://www.cartoonnetworkshop.com/checkout/shippingfirstcheckout.do?method=view      10/23/2015

Cartoon Network Shop

Page 2 of 2

**CUSTOMER SERVICE**
Track Order
How to Order
FAQ
Shipping & Delivery
Tax Information
Returns & Exchanges
Contact Us
(866) 373-2107

**SECURITY AND PRIVACY**
Privacy Policy
Terms & Conditions
Safe Shopping Guarantee

**ABOUT THE SHOP**
Affiliate Program
Volume Discounts
CartoonNetwork.com
**WE ACCEPT:**



CartoonNetworkShop.com is operated under a license from Cartoon Network by Bolder Road LLC,
which is solely responsible for the site's content and all aspects of your purchase.
℗ 2015 All Rights Reserved

™ & © 2015 Cartoon Network