NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BILLY MITCHELL,<br><br>Plaintiff,<br><br>v.<br><br>THE CARTOON NETWORK, INC., a New York Corp., CARTOON NETWORK STUDIOS, INC., a Georgia Corporation, TURNER BROADCASTING SYSTEM, INC., a Georgia Corporation, John Does 1 through 10, fictitious designations,<br><br>Defendants. | Civ. No. 15-5668<br><br>**OPINION** |

THOMPSON, U.S.D.J.

      This matter comes before the Court upon the Motion of Defendants The Cartoon Network, Inc., Cartoon Network Studios, Inc., and Turner Broadcasting System, Inc. ("Defendants") to Dismiss the Complaint of Plaintiff Billy Mitchell ("Plaintiff"), or in the alternative, to transfer venue. (ECF No. 8). Plaintiff opposes this Motion. (ECF No. 13). The Court has issued the Opinion below based upon the written submissions of the parties and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated herein, Defendants' Motion to Dismiss will be granted.

BACKGROUND

      This case arises out of the alleged misappropriation of Plaintiff's likeness for a character in Defendants' television show, *The Regular Show*. Plaintiff is a well-known figure in the video gaming community, recognizable by his long black hair and black beard, black suit or dress shirt,

1

and American flag tie. At various points since the 1980s, Plaintiff has held the world record for high scores in the classic arcade games Donkey Kong and Pac-Man. Plaintiff has competed in international gaming competitions, hosted gaming industry events, and even appeared on a trading card. But Plaintiff is perhaps most widely known for his role as the antagonist in the documentary *The King of Kong: A Fistful of Quarters*, which chronicles another gamer's attempt to surpass Plaintiff's world record for the game Donkey Kong. In the film, Plaintiff is portrayed as successful but arrogant, beloved by fans, and at times, willing to do whatever it takes to maintain his world record. In particular, the film shows Plaintiff attempting to maintain his world record by questioning his opponent's equipment and the authenticity of his opponent's submission of a filmed high score.

      Plaintiff alleges that Defendants misappropriated his likeness for a character in *The Regular Show*, a comedic animated television series that airs on The Cartoon Network. The series revolves around the adventures of two anthropomorphic animals, a blue jay named Mordecai and a raccoon named Rigby. Plaintiff bases his claim on a character named Garrett Bobby Ferguson ("GBF") who appears as the villain in an episode entitled *High Score* and has brief appearances or mentions in three subsequent episodes. GBF appears as a giant floating head from outer space, with long black hair and a black beard, but no body.

      In *High Score*, Mordecai and Rigby attempt to earn respect by mastering an arcade game called Broken Bonez in their local coffee shop. After they successfully set the game's world record, GBF appears in the coffee shop from outer space, bragging that he still holds the game's "universe record." Mordecai and Rigby challenge GBF to play for the universe record. Mordecai and Rigby almost beat GBF's record, but ultimately throw the match when GBF begs them to let him win, claiming that he has devoted his entire life to the game, that he played so

much his wife left him, and that the universe record is all he has. After Mordecai and Rigby lose, GBF reveals that he lied to win: he did not devote his life to the game, and he never had a wife. In the end, Mordecai and Rigby do beat GBF's universe record, and the enraged GBF explodes into goo.

In a Complaint filed July 21, 2015, Plaintiff alleges that Defendants appropriated his likeness for the GBF character without his consent, for the purpose of increasing sales and profits. (ECF No. 1). Although Plaintiff does not point out specific similarities between himself and GBF, Plaintiff highlights his recognizable long black hair and black beard, which are similar to those on GBF, as well as "certain expressions and call words which are unique to [Plaintiff's] persona." (*Id.* at 8). Plaintiff alleges that using his image and likeness "helped to legitimize" Defendants' show, increased viewership, and added to ancillary product sales[1] by creating a realistic villain and an endorsement of the show for the gaming community. (*Id.* at 9-10). As a result, Plaintiff claims to have suffered damages to be proven at trial.

In response, Defendants filed a Motion to Dismiss, or in the alternative, to transfer venue. (ECF No. 9). Defendants acknowledge that the GBF character is "an obvious parody of [Plaintiff's] appearance in *The King of Kong*," (*id.* at 9), but argue that Plaintiff fails to state a claim upon which relief can be granted. Defendants argue that Plaintiff's right of publicity claim is barred by the First Amendment because the GBF character satisfies the Transformative Use Test, the balancing test for resolving conflicts between the right of publicity and the First Amendment in New Jersey. (*Id.* at 17). In the alternative, Defendants request a transfer of

---

[1] Plaintiff does not provide specific examples of ancillary product sales related to the misappropriation of his likeness, and Defendants dispute that they incorporate Plaintiff's likeness into any products beyond the GBF character in the television show. (Mem. in Supp. of Defs.' Mot. to Dismiss 30 n.16, ECF No. 9).

venue, alleging that venue is improper because none of the parties reside in New Jersey, and no substantial part of the underlying events occurred in New Jersey. (*Id.* at 31). This Motion is presently before the Court.

## DISCUSSION

### A. Legal Standard

A motion under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The defendant bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id*. (quoting *Ashcroft v. Iqbal*, 56 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court may disregard any conclusory legal allegations. *Id*. Finally, the court must determine whether the "facts are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679). Such a claim requires more than a mere allegation of an entitlement to relief or demonstration of the "mere possibility of misconduct;" instead, the facts must allow a court reasonably to infer "that the defendant is liable for the misconduct alleged." *Id*. at 210, 211 (quoting *Iqbal*, 556 U.S. at 678-79).

B. Analysis

   *1. Elements of a right of publicity claim*

New Jersey law recognizes that "[t]he right to exploit the value of [an individual's] notoriety or fame belongs to the individual with whom it is associated," as an individual's "name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation." *McFarland v. Miller,* 14 F.3d 912, 919, 923 (3d Cir. 1994). Such a claim is known as misappropriation of another's likeness, or a right of publicity claim.

To establish a prima facie case for a right of publicity claim, a plaintiff must establish that 1) the defendant appropriated the plaintiff's likeness, 2) without the plaintiff's consent, 3) for the defendant's use or benefit, and 4) causing damage. *Jeffries v. Whitney E. Houston Acad. P.T.A.*, No. A-1888-08T3, 2009 WL 2136174, at *3 (N.J. Super. Ct. App. Div. July 20, 2009); *see also Prima v. Darden Restaurants, Inc.*, 78 F. Supp. 2d 337, 349 (D.N.J. 2000); *Castro v. NYT Television,* 851 A.2d 88, 97 (N.J. Super. Ct. App. Div. 2004).

Here, Plaintiff alleges that Defendants appropriated his likeness for the character GBF without his consent. Plaintiff further alleges that Defendants appropriated his likeness for the benefit of increasing sales and profits, and that he suffered damage as a result. Accepting all of the Plaintiff's well-pleaded allegations as true, Plaintiff has established all of the elements of a right of publicity claim. However, Defendants do not dispute Plaintiff's satisfaction of these elements in their Motion to Dismiss. Instead, Defendants assert that the First Amendment bars Plaintiff's right of publicity claim, regardless of whether the claim has merit.

*2. Defendants' alleged grounds for dismissal*

Defendants acknowledge that the GBF character is an obvious parody of Plaintiff's appearance in *The King of Kong*. But Defendants counter that the First Amendment protects their use of Plaintiff's identity.

While ordinarily a party may not raise an affirmative defense such as a First Amendment defense at the motion to dismiss stage, a party may do so if the defense is apparent on the face of the complaint. *See, e.g.*, *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014). In deciding a motion to dismiss, courts may consider the complaint itself, as well as "(1) matters attached to the complaint, (2) matters incorporated into the pleadings by reference, (3) matters of public record, and (4) matters integral to or upon which plaintiff's claim is based." *In re Bayside Prison Litig.*, 190 F. Supp. 2d 755, 760 (D.N.J. 2002) (internal citations removed); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Despite Plaintiff's assertions to the contrary, the only pieces of evidence needed to decide the question of misappropriation in this case are the episodes of *The Regular Show* featuring the GBF character and the representation of Plaintiff in the film *The King of Kong*.[2] *See, e.g.*, *Winstead v. Jackson*, 509 F. App'x 139, 143 (3d Cir. 2013) (affirming dismissal of copyright infringement claim for lack of substantial similarity based on the court's review of the relevant subject works, as "the District Court had before it all that was necessary in order to make the required determination"). Because Defendants' First Amendment defense is apparent on the face

---

[2] Plaintiff asserts that dismissal at this stage would be premature because discovery would allow him to explore "what efforts, if any, were made by the Defendants and the creators of the Regular Show to transform [Plaintiff's] direct likeness." (Pl.'s Opp. to Defs.' Mot. to Dismiss 20, ECF No. 13). However, under the Transformative Use Test discussed herein, the efforts to transform a likeness are not relevant to the inquiry so long as that likeness is actually transformed—a determination that can be made by viewing the works in question.

of the Complaint, and the episodes of *The Regular Show* and *The King of Kong* are incorporated into the Complaint by reference, (*see* Compl. ¶¶ 17(Z), 23, ECF No. 1), the Court may consider these matters without converting the current Motion to a motion for summary judgment. *See, e.g.*, *Tanikumi v. Walt Disney Co.*, 616 F. App'x 515, 518 (3d Cir. 2015) (finding that the district court could consider the disputed works in a copyright infringement case when ruling on a motion to dismiss); *Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 765 (D.N.J. 2011), *rev'd on other grounds,* 717 F.3d 141 (3d Cir. 2013); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690-91 (7th Cir. 2012). Therefore, the Court will at this time consider Defendants' First Amendment defense upon review of the relevant works.

The First Amendment protects freedom of expression in entertainment, including "motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works." *Tacynec v. City of Philadelphia*, 687 F.2d 793, 796 (3d Cir. 1982). However, "instances can and do arise where First Amendment protections yield in the face of competing interests." *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 150 (3d Cir. 2013), *cert. dismissed,* 135 S. Ct. 43 (2014). The Third Circuit resolves conflicts between the First Amendment and right of publicity claims through a balancing analysis called the Transformative Use Test. *Id.* at 165.

The Transformative Use Test asks whether the defendant's use of a plaintiff's likeness consists of "merely a copy or imitation" of the plaintiff or whether the defendant "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 159, 164. Works that add something new are protected by the First Amendment, whereas works that contain merely a copy or imitation are not. *See id.* at 160. This is because "works of parody or other distortions of the celebrity figure are not, from

7

the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect." *Id.* at 159 (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 808 (Cal. 2001)).

As an example of a transformative work, the Third Circuit cited with approval the California Supreme Court's decision in *Winter v. DC Comics*, 69 P.3d 473, 475 (Cal. 2003). *Winter* involved DC Comics' alleged misappropriation of the likenesses of two musicians for characters in a comic book. The musicians, Johnny and Edgar Winter, had long white hair and albino features. *Id.* at 476. The Winter brothers brought suit over images of two half-man, half-worm creatures, both with long white hair and albino features, named Johnny and Edgar Autumn. *Id.* In applying the Transformative Use Test, the California Supreme Court found that

> [a]lthough the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally. Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized. To the extent the drawings of the Autumn brothers resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature. And the Autumn brothers are but cartoon characters—half-human and half-worm—in a larger story, which is itself quite expressive.

*Id.* at 479. Consequently, the court rejected the Winter brothers' right of publicity claims, because "fans who want to purchase pictures of [the Winter brothers] would find the drawing of the Autumn brothers unsatisfactory as a substitute for conventional depictions." *Id.*

In contrast, courts have found works to be non-transformative where the work involved mere copies or imitation, such as a college football video game where the user could choose to play as an avatar of a real player, Ryan Hart. In *Hart*, the Court found the use to be non-transformative because "[n]ot only does the digital avatar match [Hart] in terms of hair color,

8

hair style and skin tone, but the avatar's accessories mimic those worn by [Hart] during his time as a Rutgers player," which "accurately tracks [Hart's] vital and biographical details." *Hart*, 717 F.3d at 166.  More importantly, "[t]he digital Ryan Hart does what the actual Ryan Hart did while at Rutgers: he plays college football, in digital recreations of college football stadiums, filled with all the trappings of a college football game." *Id.*  The game developers profited because video game users enjoyed and purchased more games produced by the defendant "as a result of the heightened realism associated with actual players." *Id.* at 168 (internal citation omitted).

Similarly, in *No Doubt v. Activision Publ'g, Inc.*, 122 Cal. Rptr. 3d 397 (Cal. Ct. App. 2011), another case cited with approval by the Third Circuit, the California Court of Appeal found video game avatars to be non-transformative where the user could choose to play as a member of a real band, No Doubt.  The band members' appearances and names were not altered. Even though the avatar could play in fanciful venues like outer space or sing songs that the band member would not ordinarily sing, the court found that the game developers did not do enough to transform the characters.  *Id.* at 411.  These additions did not transform the avatars because the avatars still performed rock songs, the same activity by which the band achieved its fame, as literal recreations of band members from No Doubt.  *Id.*

Plaintiff's claim involves Defendants' television program, which as a work of entertainment, enjoys some protection under the First Amendment.  But the Court must balance Defendants' First Amendment protections against Plaintiff's plausible claim for relief under the right of publicity.  Applying the Transformative Use Test, this Court finds that Defendants' GBF character is transformative and thus protected by the First Amendment against Plaintiff's right of publicity claim.

The GBF character resembles Plaintiff because both have long black hair and a beard. GBF also has a similar backstory to Plaintiff's portrayal in *The King of Kong*, in that both held records at video games, and both are portrayed as arrogant yet successful, beloved by fans, and willing to go to great lengths to maintain their titles. But while GBF may be a less-than-subtle evocation of Plaintiff, GBF is not a literal representation of him. The television character does not match the Plaintiff in appearance: GBF appears as a non-human creature, a giant floating head with no body from outer space, while Plaintiff is a human being. Nor does GBF's story exactly track Plaintiff's biographical details. GBF holds the universe record at Broken Bonez; Plaintiff held the world record at Donkey Kong. GBF attempts to maintain his universe record through crying and lying about his backstory; Plaintiff maintained his world record by questioning his opponent's equipment and the authenticity of his submission of a filmed high score. Plaintiff himself acknowledges that GBF is not a literal representation of him when he states that "[t]he actions of this character . . . make me look like some sort of monster, or creature, with no heart or decency. This is simply not me." (Decl. of Billy Mitchell, ECF No. 13-1).[3]

These comparisons show that the GBF character is more like the characters who have been found to be transformative than those who have been found to be non-transformative. Unlike the non-transformative football player avatars at issue in *Hart*, GBF is not a literal recreation of Plaintiff who does exactly what Plaintiff does in real life. Nor is GBF a literal

---

[3] Plaintiff also notes that the GBF character "places [him] in a very unfavorable light." (Decl. of Billy Mitchell). While this might be relevant to a false light or defamation claim, Plaintiff has not brought either of these claims in the present action. The fact that the GBF character places Plaintiff in an unfavorable light does not bolster Plaintiff's right of publicity claim, and in fact makes it more likely that character has been distorted for purposes of lampoon, parody, or caricature. *See Winter*, 69 P.3d at 479.

recreation of Plaintiff placed in a fanciful setting, like the avatars from *No Doubt*. GBF is not a literal recreation of Plaintiff at all: GBF looks different from Plaintiff, comes from a different planet, plays a different game, holds a different record, and uses different methods to secure his high score. While at the highest level of generality, both Plaintiff and GBF compete at video games, this broad commonality does not make GBF and Plaintiff similar enough to make GBF non-transformative.

Rather, GBF resembles the transformative Autumn brothers characters from *Winter*. Like the Autumn brothers, GBF has some of the recognizable traits of the source material, but he is turned into a supernatural creature. The Autumn brothers were transformed from two men with long white hair and albino features to two half-man, half-worm creatures, both with long white hair and albino features. GBF is transformed from a man with long black hair and a beard to a floating head with long black hair and a beard. Both the Autumn brothers and GBF are placed in a larger story arc which is itself quite expressive. And also like the Autumn brothers, GBF is an exaggerated version of Plaintiff distorted for lampoon, parody, or caricature. Rather than merely being recognizable by his hair and beard, GBF appears as *only* hair and a beard. Rather than holding the world record at a well-known game, GBF holds the record for the entire universe. Rather than questioning his opponents' honesty, GBF simply begs his opponents to let him keep his high score. And when GBF loses his title, the character literally explodes, unlike Plaintiff. By exaggerating Plaintiff's well-known traits to make the GBF character "cartoonishly evil," (*See* Mem. in Supp. of Defs.' Mot. to Dismiss 27), the Defendants have added something new, transforming their appropriation of Plaintiff's likeness and making their television show a poor substitute for conventional depictions of Plaintiff.

Because they have added something new, Defendants' appropriation of Plaintiff's identity passes the Transformative Use Test, and thus receives the protection of the First Amendment.  This also means that Plaintiff has failed to state a claim upon which relief can be granted, and so the case must be dismissed.

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss will be granted.  Defendants' Motion in the alternative to transfer venue will be denied as moot.  An appropriate Order follows.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.